FILED
2013 Sep-06 PM 04:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT A

# Transcript of the Deposition Testimony of:

## CHARLES HUNT

**DATE:** 08-09-2013

CASE:   CHARLES HUNT

VS

21ST MORTGAGE CORPORATION

*COPY*

DANIEL COURT REPORTING
1310 32ND STREET SOUTH
BIRMINGHAM, AL 35205
205-250-7765
877-250-7779
danielreporting@aol.com

1      Q.   Okay.  When did you and
2  Mrs. Hunt get married?
3      A.   2007.
4      Q.   Do you know the date?
5      A.   It was November 23rd.
6      Q.   Prior to getting married, how
7  long did you all live together?
8      A.   Probably two years.
9      Q.   Okay.  And as far as the house
10 in Warrior is concerned, how long have you
11 all lived in that house?
12     A.   My wife has lived there most of
13 her life.
14     Q.   And when did you start living
15 there?
16     A.   Actually, I commute back and
17 forth, work in Atlanta and come home on the
18 weekends.
19     Q.   When did you start --
20     A.   So it's been four years.
21     Q.   Okay.  Is your house in Georgia
22 actually in Atlanta?
23     A.   Stone Mountain.

1        Q.   All right.  Back on.  When did
2   you first have any contact whatsoever with
3   21st Mortgage Corporation?
4        A.   2006.
5        Q.   What was your first contact with
6   them?
7        A.   I called in to make a payment.
8        Q.   Did you call in to make a
9   payment on your cell phone?
10       A.   I don't recall.
11       Q.   And this was before you all were
12  married?
13       A.   Yes.
14       Q.   Okay.  What were the
15  circumstances of your arrangement to make a
16  payment?  Is it just something that you told
17  Amelia you would do for her?
18       A.   Yes, helping her out and her
19  son.
20       Q.   Okay.  How did you get the
21  telephone number for 21st Mortgage?
22       A.   Their bill.
23       Q.   Do you remember where you were

1  when that call was made?  Were you in
2  Georgia or over here?
3         A.  I don't remember.
4         Q.  Was Amelia with you?
5         A.  No.
6         Q.  Were you by yourself?
7         A.  Yes.
8         Q.  Okay.  Tell me about that first
9  conversation you had with somebody from
10 21st.
11        A.  I gave them a check number, or
12 it could have been my check card and email.
13        Q.  What bank account was that paid
14 out of?
15        A.  Prior to Wells Fargo, it may
16 have been -- whatever Wells Fargo -- they
17 actually bought it out from Bank of the
18 South, I believe.
19        Q.  I mean, yeah -- I understand.
20            MR. PHILLIPS:  Too much
21 consolidation.
22        Q.  I understand the confusion.  Was
23 that a personal bank account or a business

```
 1   bank account?
 2        A.   Personal.
 3        Q.   Let me back up for a second.
 4   Have you ever had any other marriages?
 5        A.   Yes.
 6        Q.   All right.  How many other
 7   marriages?
 8        A.   One.
 9        Q.   When were you married?
10        A.   I believe it was 1978.
11        Q.   Okay.  And who were you married
12   to?
13        A.   Joy Hunt.
14        Q.   What was her maiden name?
15        A.   Koch, K-O-C-H.
16        Q.   And how long were you all
17   married?
18        A.   Eighteen years.
19        Q.   I can't do math.  When was the
20   divorce, what year?
21        A.   Let's see --
22             MR. PHILLIPS:  It would be '96.
23        A.   '96.
```

Case 2:12-cv-02697-WMA   Document 30-1   Filed 09/06/13   Page 7 of 16
DANIEL COURT REPORTING, INC.

Page 29

```
 1          Q.   When was the next contact you
 2   had with anybody from 21st Mortgage?
 3          A.   I don't remember.
 4          Q.   Okay.  Do you remember what the
 5   circumstances of your next contact would
 6   have been?  Would it have been making a
 7   payment?  Would it have been calling to
 8   see --
 9          A.   Yes, it would have been making a
10   payment.
11          Q.   Okay.  How often were you making
12   these payments on this account?
13          A.   It would vary.  It depended on
14   whether Amelia had the money or her son had
15   the money to pay it.
16          Q.   Okay.  Let's say over the course
17   of the year 2006, how many payments do you
18   think you made?
19          A.   I don't remember.
20          Q.   Would all of those payments have
21   been -- would they have been made out of
22   that same account?
23          A.   Yes.
```

```
 1          Q.  Did you always pay either check
 2  by phone or your debit card?
 3          A.  Yes.
 4          Q.  When was the first time you had
 5  any communication from anybody from 21st
 6  that did not have anything to do with your
 7  calling to make a payment?
 8          A.  I don't remember.  Probably
 9  within a year of the first time I talked to
10  them.
11          Q.  So -- okay.  Within a year.
12  What was the first communication you recall
13  from someone at 21st that did not deal with
14  you making a payment?
15          A.  Probably within that year period
16  of time, wanting to know when they would
17  make a payment -- or when we would make
18  another payment.
19          Q.  Do you remember who you were
20  speaking with at any of those calls leading
21  up to that point?
22          A.  I'm not specifically sure if it
23  was Amanda Greene.
```

Case 2:12-cv-02697-WMA   Document 30-1   Filed 09/06/13   Page 9 of 16
DANIEL COURT REPORTING, INC.

Page 109

1        Q.  Were you usually at work when
2   these calls happened?
3        A.  Yes.  Seven to --
4        Q.  Right.
5        A.  Six or seven usually.
6        Q.  How about on the weekends?  Did
7   they call on the weekends that you recall?
8        A.  Yes, they called on the
9   weekends.
10       Q.  Did the number of calls on the
11  weekends decrease, increase or stay the same
12  as they were during the --
13       A.  I'm not sure.  The records
14  should speak for themselves.
15       Q.  When you would receive a call
16  from 21st and you would answer it, was there
17  anything that led you to believe that that
18  call was not dialed by somebody just dialing
19  your number and calling you?
20       A.  There was no way to tell.
21       Q.  Okay.  No excessively long waits
22  or prerecorded, anything like that?
23       A.  Not that I'm aware of.

Case 2:12-cv-02697-WMA   Document 30-1   Filed 09/06/13   Page 10 of 16

DANIEL COURT REPORTING, INC.

Page 110

```
 1        Q.   Okay.  Were any of the messages
 2   that you received on your cell phone voice
 3   mail, do you think that they were
 4   prerecorded or machine, automated, anything
 5   like that?
 6        A.   Not to my knowledge.
 7        Q.   Do you know what an auto dialer
 8   is?
 9        A.   I do now, yes.
10        Q.   Okay.  And tell me what your
11   understanding of an auto dialer is.
12        A.   It dials and when you answer, it
13   puts you in touch with somebody to talk to.
14        Q.   Is there anything that leads you
15   to believe -- other than something you may
16   have learned from your attorney -- that 21st
17   was using an auto dialer to call you on your
18   cell phone?
19             MR. PHILLIPS:  Object to the
20   form.  You can answer.
21        A.   I couldn't tell to be honest.
22        Q.   What's your understanding -- is
23   that -- have you told me the full extent of
```

1310 32ND STREET SOUTH, BIRMINGHAM, AL    35205
205-250-7765                    danielreporting@aol.com

```
 1   your understanding of an auto dialer?
 2        A.   Yes.  It's -- they call up -- a
 3   machine calls you and then if you actually
 4   answer the phone, then it puts you in touch
 5   with a person.  I have --
 6        Q.   You have no way of knowing?
 7        A.   You have no way of knowing.
 8        Q.   Okay.  What about a predictive
 9   dialer, do you know what that is?
10        A.   No, sir, I do not.
11        Q.   Did you ever hear -- again, I'm
12   not talking about anything you ever heard
13   from your attorney -- did you have any
14   reason to believe anybody from 21st Mortgage
15   was using a predictive dialer?
16        A.   I'm not sure what a predictive
17   dialer is.
18        Q.   Okay.  And did you ever have any
19   reason to believe that they were using any
20   kind of prerecorded voice?
21        A.   I have not heard a prerecorded
22   voice, no.
23        Q.   Other than the bank account
```

1   August 12th, 2011, that those calls were
2   made?
3          A.   The next two to three days.
4          Q.   Okay.  After that, after you
5   received --
6          A.   They stopped.
7          Q.   And after that, you had no more
8   contact with anybody --
9          A.   That's correct.
10         Q.   -- from 21st probably until me
11  sitting here today?
12         A.   Correct.
13         Q.   My sitting here today.  All
14  right.
15              I briefly want to go through the
16  documents I requested to make sure we're not
17  overlooking something.
18         A.   Okay.
19         Q.   If you'll look at Defendants'
20  Exhibit 2, and I specifically asked about
21  correspondence between you, and I mean
22  Charles Hunt --
23         A.   Correct.

1       Q.   Okay.
2       A.   So --
3       Q.   All right.
4       A.   The timeliness of them calling me while I'm operating equipment, and I have crews out there. I'm running ditch witches and backhoes and it was -- that was quite stressful, as far as my work was concerned. I'd have to stop what I'm doing and downtime to go answer the phone or try to deal with them.
12      Q.   Anything else?
13      A.   That should cover it.
14      MR. MITCHELL: Okay. I appreciate your time today.
16      THE WITNESS: Thank you.
17      MR. PHILLIPS: I have just a few follow-up.
19
20                  EXAMINATION
21  BY MR. PHILLIPS:
22      Q.   Mr. Hunt, you were just now talking about your job you worked with heavy

```
 1   equipment, ditch witches and things of that
 2   nature.  Most of your jobsites are outdoors,
 3   aren't they?
 4        A.   Yes.
 5        Q.   And usually your jobsites are
 6   loud and noisy environments, aren't they?
 7        A.   Correct.
 8        Q.   And earlier, you were asked
 9   questions about auto dialers, but when you
10   received the majority of the calls from 21st
11   Mortgage, you were actually on the jobsite,
12   were you not?
13        A.   Yes.
14        Q.   And in these loud environment?
15        A.   Correct.
16             MR. MITCHELL:  Object to the
17   form.
18        Q.   When -- the conversation earlier
19   where we talked about with Kevin Bunch and
20   you stated he was asking you about how much
21   money you made per week, what were you doing
22   at the time of that call?
23        A.   Working.
```

1  expect nothing less from you, buddy.
2         MR. PHILLIPS:  Of course.
3     Q.  Back to this whole loud jobsite
4  work environment, were there times that you
5  had phone calls you received from 21st where
6  you weren't around loud equipment?
7     A.  Yes.
8     Q.  Is there anything from those
9  phone calls or any other phone call that led
10 you to believe that they may have been made
11 with a predictive dialer, an automatic
12 dialer, anything -- prerecorded call or
13 anything like that?
14        MR. PHILLIPS:  Object to the
15 form.
16    A.  I'm not sure.  I couldn't tell
17 you what they did or not.
18    Q.  But nothing leads you to believe
19 that they did?  I mean, we talked about this
20 earlier?
21    A.  Right.
22    Q.  Is your testimony any different
23 than it was earlier?

1      A.  No.

2      Q.  Just to confirm again, you're
3  not claiming lost wages?

4      A.  No, I'm not.

5          MR. MITCHELL:  Okay.  We're
6  done.  Thank you.  I appreciate it.

7          THE WITNESS:  Thank you.

8          THE COURT REPORTER:  Do you need
9  a copy?

10         MR. PHILLIPS:  Yes, ma'am.  I'll
11 take a travel copy.

12

13         Deposition of CHARLES HUNT
14            Concluded at 5:02 p.m.
15               August 9, 2013

16

17

18

19

20

21

22

23