FILED

2013 Dec-06  PM 04:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **CHARLES HUNT,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **CASE NO.:  2:12-cv-2697-WMA** |
| | ) | |
| **21ST MORTGAGE CORPORATION,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

---

## DEFENDANT'S BRIEF IN SUPPORT OF ITS
## MOTION FOR SUMMARY JUDGMENT

---

COMES NOW the Defendant, 21st Mortgage Corporation ("21st Mtg." or "Defendant"), and hereby provides this Brief in support of its Motion for Summary Judgment.

## <u>TABLE OF CONTENTS</u>

UNDISPUTED RELEVANT MATERIAL FACTS...................................2

LEGAL STANDARD...............................................................8

ARGUMENT.......................................................................9

   I.    TCPA 47 U.S.C. § 227 et seq: ..........................................9

   II.   Negligent, Reckless, Wanton, Malicious and/or Intentional Conduct:..12

   III.  Negligent Hiring, Training, and/or Supervision of Employees and/or Agents...............................................................15

   IV.  Invasion of Privacy by Intrusion upon Seclusion: ......................17

   V.   FDCPA 15 U.S.C. § 1692 et seq. ........................................24

## UNDISPUTED RELEVANT MATERIAL FACTS

1.      Plaintiff, Charles DeWitt Hunt, Jr. is married to Amelia Hunt f/k/a Amelia Hardiman.   (EXHIBIT   A, Deposition of Charles Hunt at page 8, hereinafter "Hunt at __").   The Hunts were married on November 23, 2007.   (Hunt at 9).

2.      On or about June 26, 2000, Bradley Faile (Mrs. Hunt's son) entered into a Manufactured Home Retail Installment Contract, Security Agreement and Disclosure Statement (hereinafter "Installment Contract") with Chase Manhattan Bank ("Chase").   (EXHIBIT B, Affidavit of Chris Caldwell and Exhibit 1 thereto). Plaintiff's wife, Amelia Hunt[1] f/k/a Amelia Hardiman was a co-signor on the Installment Contract with her son.   (EXHIBIT B, Affidavit of Chris Caldwell and Exhibit 1 thereto).   The Installment Contract was assigned to Chase Manhattan Bank ("Chase").   (EXHIBIT B, Affidavit of Chris Caldwell).

3.      21st Mtg. specializes in financing of manufactured housing through direct lending, broker lending and indirect lending.   It originates its own loans and

---

[1] Amelia Hunt filed an almost identical suit against 21st Mtg.  Mrs. Hunt's "First Amended Complaint contain[ed] five counts to relief. (Doc. # 1–2).  [She] assert[ed] violations of the TCPA (Count 1); a state law claim for negligent, reckless, wanton, malicious, and/or intentional conduct (Count 2); a state law claim for negligent hiring, training, and/or supervision of employees and/or agents (Count 3); a state law claim for invasion of privacy by intrusion upon seclusion (Count 4); and violations of the FDCPA (Count 5)."  Hunt v. 21st Mortgage Corp., 2:12-CV-381-RDP, 2012 WL 3903783 (N.D. Ala. Sept. 7, 2012) (Opinion from Amelia Hunt v. 21st Mtg. Corporation, Northern District of Alabama, Southern Division, Case Number 2:12-CV-381-RDP, removed from the Circuit Court of Jefferson county, Alabama, CV – 2011-904460.00).

also services loans.  (EXHIBIT C and Deposition of Chris Caldwell at page 14, hereinafter, "Caldwell at ___").

4.      In December of 2004, 21st Mtg. Corporation became the servicer and holder of the Installment Contract.  (EXHIBIT B, Affidavit of Chris Caldwell and Exhibit 2 thereto; EXHIBIT D, Deposition of Walden Buttram[2] at 67-68, hereinafter "Buttram at ___").  21st Mtg. began servicing the Installment Contract in January of 2005.  (EXHIBIT  B, Affidavit of Chris Caldwell).  At the time that 21st Mortgage Corporation started servicing the Contract, it was not in default. (EXHIBIT B, Affidavit of Chris Caldwell and Exhibit 3 thereto).

5.      Plaintiff, Charles Hunt first had contact with 21st Mtg. when he personally called 21st Mtg. on September 30, 2005 to make a payment on the Contract.  (Hunt at 22 and Caldwell at 108).  Mr. Hunt made the payment out of his own personal bank account.  (Hunt 22-24).  Mr. Hunt continued to call 21st Mtg. and make payments.  (Hunt at 29-30).

6.      Mr. Hunt made payments over the telephone on at least thirty occasions beginning in September of 2005 and ending in July of 2011.  (EXHIBIT B, Affidavit of Chris Caldwell and Exhibit 4 thereto).  Mr. Hunt personally called 21st Mtg. on numerous occasions to make payments.  (EXHIBIT B, Affidavit of Chris Caldwell and Exhibit 4 thereto).

---

[2] Walden Buttram took over the Portfolio Manager position over the Chase Portfolio in 2007 from Chris Caldwell.  (Buttram at 26, 28).

7.    The Financial Counselor notes, attached to the Affidavit of Chris Caldwell as Exhibit 4, indicate an incoming call in the "Action" column by an entry of the number "6". (Caldwell at 108-109, 123).  With the exception of the October 30, 2010, October 1, 2010 and December 31, 2009 entries, all of the notes indicate the number "6" for the Action Code. (EXHIBIT  4 to the Affidavit of Chris Caldwell).

8.    The last payment was made by Mr. Hunt on July 18, 2011 when he called 21st Mtg. and authorized a check by phone payment.  (EXHIBIT B, Affidavit of Chris Caldwell and Exhibit 4 thereto).

**THE TELEPHONE NUMBER**

9.    The only telephone number at issue in this matter is (770) 231-****.[3] (hereinafter "Subject Telephone Number" or "Mr. Hunt's Telephone Number"). (Hunt at 18).  On March 12, 2008, Amelia Hunt gave 21st Mtg. Mr. Hunt's Telephone Number and told 21st Mtg. to call Mr. Hunt.  (Caldwell at 121-122, Exhibit 4 to Mr. Caldwell's Affidavit stamped as C. Hunt 87).

10.    The majority, if not all, of the calls to make payments were made by Mr. Hunt from the Subject Telephone Number. (Hunt at 32).

---

[3] The last four digits have been redacted out of concern for Plaintiff's privacy.

11.   At first, the Hunts made payments "pretty regularly." (Hunt at 39). When the economy declined, it became more difficult for the Hunts to make payments. (Hunt at 39-40).

12.   Mr. Hunt claims that 21st. Mtg. knew that he was the person making the payments on the loan. (Hunt at 54-55).

## SPECIFIC CONVERSATIONS

13.   Mr. Hunt could only recall the name of two of 21st Mtg.'s employees, Amanda and Kevin. (Hunt at 68). Mr. Hunt testified that while Amanda's tone of voice was at times really stern, she never made threats, used foul language or anything like that. (Hunt at 41-42, 44).

14.   Other than having stern conversations with employees of 21st Mtg., Mr. Hunt does not claim that any threats were made. (Hunt at 41-42, 44, 52, 57-58). No one from 21st Mtg. ever told Mr. Hunt that he was directly liable for the debt. (54-55).[4]

---

[4] Mr. Hunt did testify that he believed that an employee indirectly told him he was responsible for paying the debt.

 Q. ... Did Amanda ever say that you were responsible for paying that debt?
 A. Not directly, no.
 Q. Did she indirectly tell you that?
 A. Yes.
 Q. All right. How did she indirectly tell you?
 A. You're married to Amelia and you're making the payments.
 Q. Did she ever make any threats to you?
 A. No.
(Hunt at 43-44).

 Q. ...Did Amanda's manager ever tell you that he thought or 21st thought you were liable for the debt?
 A. No.

15.     Other than one occasion that Mr. Hunt alleges an employee told him to grow up and act like an adult, Mr. Hunt did not consider any other conversation out of line.  (Hunt at 106-107).

16.     No one ever cussed at him or yelled at him.  (Hunt at 107).  Mr. Hunt does not believe that anyone from 21st Mtg. ever misled him or provided him with false information.  (Hunt at 175).  No one at 21st Mtg. ever made any threats to Mr. Hunt.  (Hunt at 176).

17.     The only written notice that Mr. Hunt claims to have given to 21st Mtg. was by an August 8, 2011, certified letter sent to 21st Mtg. by his wife.  (Hunt 112-113).  Mr. Hunt did not personally sign the letter and his name was not mentioned.  (Hunt 119-121).  The return receipt has August 12, 2011 as the date the letter was received by 21st Mtg.  (Hunt at 121).

## THE TELEPHONE SYSTEM

18.     The telephone system in question in this matter is the Nortel Meridian Telephone System that was in use by 21st Mtg. from "some time in 2000 or 2001 until August 11, 2012."  (Doc. 28-1, Affidavit of Scott O'Neal and EXHIBIT  E, Deposition of Jim Collins[5] at pages 18, hereinafter "Collins at ___).

---

Q. And tell me where I'm wrong.  It sounds like they were more concerned about setting up payments - -
A. Correct.
Q. - -than who was going to pay which - -
A. **They knew I was paying it.**
(Hunt at 54-55, emphasis added).
[5] Jim Collins is 21st Mtg.'s network administrator.  (Collins at 4).  He was deposed on August 7, 2013.

6

19.     The Nortel Meridian Telephone System "was not changed during the time it was used by 21[st] Mortgage Corporation other than to add additional users and handsets."  (Doc. 28-1, Affidavit of Scott O'Neal).  A new telephone system was installed by 21st Mtg. on or about August 11, 2012.  (Collins at 18; see also Doc. 28-1, Affidavit of Scott O'Neal).

20.     The Nortel Meridian system never had auto dialing capability or predictive dialing capability.  (Collins at 28-29 and 34).  21st Mtg. never used or purchased auto dialing software.  (Doc. 28-1, Affidavit of Scott O'Neal).

21.     The Nortel Meridian System as installed and used by 21st Mortgage did not have the capability to store or produce telephone numbers to be called, using a random or sequential number generator, nor did it have the capability to dial such numbers.  (Doc. 28-1, Affidavit of Scott O'Neal).

22.     Mr Hunt has no reason to believe that 21st Mtg. was utilizing an automatic dialer, predictive dialer or prerecorded voice.  (Hunt at 109-111, 177-178, 181-182).

23.     The Nortel Meridian system required its employees to manually dial telephone numbers.  (Caldwell at 70 and Doc. 28-1, Affidavit of Scott O'Neal and Buttram at 29-30).  To place a call, an employee would look at the AS400[6] screen

---

[6] The AS400 system is a computer system which is not linked to the telephone system.  It is where the 21st Mtg. employees document conversations with customers and where the records for accounts are held. (Buttram at 31-32 and Caldwell 69-71).  It is the system that stores the information found in the Financial Counselor Notes.  (See the Affidavit of Chris Caldwell and Exhibit 4 thereto).

for the customer's number and would then manually dial the Nortel Meridian telephone. (Caldwell at 70 and Buttram at 29-30).

## PLAINTIFF'S CAUSES OF ACTION

24.    This matter was filed August 14, 2012. (Doc. 1). Mr. Hunt sets forth five causes of action against 21st Mtg.

> Count I:  Violations of the Telephone Consumer Protection Act ("TCPA") 47 U.S.C. § 227, et seq.;
>
> Count II:   Negligent, Reckless, Wanton, Malicious and/or Intentional Conduct;
>
> Count III:  Negligent Hiring, Training, and/or Supervision of Employees and/or Agents;
>
> Count IV: Invasion of Privacy by Intrusion upon Seclusion; and
>
> Count V: Violations of the Fair Debt Collection Practices Act 15 U.S.C. § 1692 et seq.

## <u>LEGAL STANDARD</u>

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to 'come forward with specific facts showing that there is a genuine issue for trial.' " Int'l Stamp Art, Inc. v. U.S. Postal Serv., 456 F.3d 1270, 1274 (11th Cir.2006) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "A party opposing a properly submitted

motion for summary judgment may not rest upon mere allegation or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial." Eberhardt v. Waters, 901 F.2d 1578, 1580 (11th Cir.1990) (quotation and brackets omitted).   Speculation or conjecture cannot create a genuine issue of material fact. Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir.2005).   "No genuine issue of material fact exists if a party has failed to 'make a showing sufficient to establish the existence of an element ... on which that party will bear the burden of proof at trial.' " Am. Fed'n of Labor & Cong. of Indus. Orgs. v. City of Miami, 637 F.3d 1178, 1186–87 (11th Cir.2011) (modification in original) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

## ARGUMENT

### I.     TCPA 47 U.S.C. § 227 et seq:

21st Mtg. incorporates herein the arguments set forth in its Brief Regarding the Significance of Equipment "Defined as Automatic Telephone Dialing System" (Doc. 30) and its Opposition to Plaintiff's Motion to Stay (Doc. 40).   In addition thereto, 21st Mtg. offers the following argument.

The Telephone Consumer Protection Act ("TCPA") provides:

> It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—

> **(A)** to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any **automatic telephone dialing system** or an artificial or prerecorded voice--
>
>                \*\*\*
>
> **(iii)** to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call;

47 U.S.C. § 227(b)(1)(iii) (emphasis added).   "The term 'automatic telephone dialing system' means equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."  47 U.S.C. § 227(a)(1).  This Honorable Court, in its September 17, 2013 Order held the following:

> The court therefore holds that, to meet the TCPA definition of an "automatic telephone dialing system," a system must have a **present** capacity, at the time the calls were being made, to store or produce and call numbers from a number generator. While a defendant can be liable under § 227(b)(1)(A) whenever it has such a system, even if it does not make use of the automatic dialing capability, it cannot be held liable if substantial modification or alteration of the system would be required to achieve that capability.

(Doc 31).

There is absolutely no evidence that 21st Mtg. utilized an "automatic telephone dialing system" ("ATDS") in this matter and therefore 21st Mtg. is not subject to the TCPA.  The telephone system in question is the Nortel Meridian Telephone System that was in use by 21st Mtg. from "some time in 2000 or 2001

until August 11, 2012." (Doc. 28-1, Affidavit of Scott O'Neal, Collins at 18). The Nortel Meridian Telephone System "was not changed during the time it was used by 21st Mortgage Corporation other than to add additional users and handsets." (Doc. 28-1, Affidavit of Scott O'Neal). A new telephone system was installed by 21st Mtg. on or about August 11, 2012.[7] (Collins at 18; see also Doc. 28-1, Affidavit of Scott O'Neal). There is absolutely no question that 21st Mortgage never purchased or utilized any software or equipment that could allow for "automatic dialing." The overwhelming undisputed evidence is that the Nortel Meridian system never had auto dialing capability or predictive dialing capability. (Collins at 28-29 and 34, Doc. 28-1, Affidavit of Scott O'Neal). It is undisputed that the Nortel Meridian system required the 21st Mortgage employees to manually dial telephone numbers. (Caldwell at 70, Buttram at 29-30 and Doc. 28-1, Affidavit of Scott O'Neal). The Nortel Meridian System installed and used by 21st Mortgage did not have the capability to store or produce telephone numbers to be called, using a random or sequential number generator, nor did it have the capability to dial such numbers. (Doc. 28-1, Affidavit of Scott O'Neal). In addition, Mr. Hunt testified that he had no reason to believe that 21st Mtg. was utilizing an automatic dialer, predictive dialer or prerecorded voice. (Hunt at 109-111, 177-178, 181-182).

---

[7] The last call that Hunt alleges was made to him by 21st Mtg. occurred two to three days after August 12, 2011. (Hunt at 122).

21st Mtg. did not have an "automatic telephone dialing system," because the Nortel Meridian system did not have a **present** capacity, at the time the calls were being made, to store or produce and call numbers from a number generator. As such, 21st Mtg. is not subject to the TCPA and thus, there is no genuine dispute as to any material fact regarding Plaintiff's TCPA claims and 21st Mtg. is entitled to judgment as a matter of law.

## II.   Negligent, Reckless, Wanton, Malicious and/or Intentional Conduct:

First, Plaintiff's allegations of negligence, recklessness, wantonness, malicious and/or intentional conduct are merely recitations of his TCPA and FDCPA claims which he couches in general terms of negligence and wantonness. However, notwithstanding the forgoing, 21st Mtg. offers the following argument.

> "To establish negligence, the plaintiff must prove: (1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury. *Albert v. Hsu,* 602 So.2d 895, 897 (Ala.1992)." *Martin v. Arnold,* 643 So.2d 564, 567 (Ala.1994). Further, " '[t]he absence of any one of these [elements] renders ... the evidence insufficient [to establish negligence].' " *Franklin v. City of Athens,* 938 So.2d 950, 953 (Ala.Civ.App.2005) (quoting *Calvert Fire Ins. Co. v. Green,* 278 Ala. 673, 677, 180 So.2d 269, 273 (1965)). Whether a legal duty exists is a question of law. *Rose v. Miller & Co.,* 432 So.2d 1237, 1238 (Ala.1983).

Woods v. SunTrust Bank, 81 So. 3d 357, 367 (Ala. Civ. App. 2011)

The necessary elements for recovery under a negligence theory are: (1) duty, (2) breach of duty, (3) proximate cause, and (4) injury. Mascot Coal Company v.

Garrett, 156 Ala. 290, 47 So. 149 (1908).   In order for Mr. Hunt to defeat a properly supported motion for a summary judgment on a negligence claim, he must present substantial evidence that 21st Mtg. owed him a duty, that the duty was breached, and that the breach proximately caused damage or injury.  _See_ Crowne Invs., Inc. v. Bryant, 638 So.2d 873 (Ala.1994).  "[T]he existence of a duty is a question of law to be determined by the trial judge." State Farm Fire & Cas. Co. v. Owen, 729 So.2d 834, 839 (Ala. 1998). It is elementary that where there is no duty, there can be no negligence. Bryant v. Morley, 406 So.2d 394 (Ala. 1981).  "In determining whether a duty exists, the courts consider factors including public policy; social considerations; foreseeability; the nature of the defendant's activity; the relationship between the parties; and the type of possible injury or harm. _Patrick v. Union State Bank,_ 681 So.2d at 1368 (citations omitted). " 'The key factor is whether the injury was foreseeable by the defendant.' " _Id._ at 1368 (quoting _Smitherman v. McCafferty,_ 622 So.2d 322, 324 (Ala.1993))" Key v. Compass Bank, Inc., 826 So. 2d 159, 170 (Ala. Civ. App. 2001). Plaintiff has no evidence whatsoever that 21st Mtg. owed a duty to him.

Further, even if this Honorable Court were to find that a duty did exist, 21st Mtg. did not breach that duty and Plaintiff did not suffer damages.  It is undisputed that Mr. Hunt did not suffer any damages as a result of the alleged negligence

and/or wantonness.   In addition, there is absolutely no evidence of reckless, wanton, malicious or intentional conduct.

To the extent that Mr. Hunt's Complaint could be construed as making claims against Defendant for Negligence Per Se for violations of the TCPA and FDCPA, Defendant offers the following argument.

> To establish negligence per se, a plaintiff must prove: (1) that the statute the defendant is charged with violating was enacted to protect a class of persons to which the plaintiff belonged; (2) that the plaintiff's injury was the kind of injury contemplated by the statute; (3) that the defendant violated the statute; and (4) that the defendant's violation of the statute proximately caused the plaintiff's injury. *Elder v. E.I. DuPont de Nemours & Co.,* 479 So.2d 1243, 1248 (Ala.1985).

Dickinson v. Land Developers Const. Co., Inc., 882 So. 2d 291, 302 (Ala. 2003).

To establish negligence per se in this matter, the Plaintiff would have to show that 21st Mtg. violated the TCPA or FDCPA.  This, the Plaintiff cannot do, based upon 21st Mtg.'s argument above regarding the TCPA and below regarding the FDCPA.

"To establish wantonness, the plaintiff must prove that the defendant, with reckless indifference to the consequences, consciously and intentionally did some wrongful act or omitted some known duty. To be actionable, that act or omission must proximately cause the injury of which the plaintiff complains." *Martin,* 643 So.2d at 567." Woods v. SunTrust Bank, 81 So. 3d 357, 367 (Ala. Civ. App. 2011)

> Under Alabama law, wantonness is defined as "the conscious doing of some act or the omission of some duty which under knowledge of existing conditions and while conscious that, from the doing of such act or the omission of such duty, injury will likely be the probable

result...." *Roberts v. Brown,* 384 So.2d 1047, 1048 (Ala.1980) (citations omitted). "[B]efore a party can be said to be guilty of wanton conduct it must be shown that ***with reckless indifference to the consequences*** he ***consciously and intentionally did some wrongful act*** or omitted some known duty which produced the result." *Id.* (citations omitted) (emphasis added).

Lindsey v. NCO Fin. Sys., Inc., 2:11-CV-03183-WMA, 2012 WL 3999870 (N.D. Ala. Sept. 12, 2012).   There is absolutely no evidence whatsoever that with reckless indifference to the consequences 21st Mtg. consciously and intentionally did some wrongful act or omitted some known duty owed to Mr. Hunt.  Therefore, Plaintiff's claims for wantonness must fail.  In addition,  there is absolutely no evidence whatsoever that any action or inaction on the part of 21st Mtg. could rise to the level of Malicious and/or Intentional Conduct.

As is shown above, there is no genuine dispute as to any material fact regarding Plaintiff's negligence, recklessness, wantonness, malicious and/or intentional conduct claims and 21st Mtg. is entitled to judgment as a matter of law.

### III.  Negligent Hiring, Training, and/or Supervision of Employees and/or Agents:

Plaintiff claims that 21st Mtg. "negligently, wantonly, and/or intentionally hired, retained, or supervised incompetent personnel, who were allowed or encouraged to violate the law as was done to Plaintiff..." (Doc. 1, ¶ 65).  Again, 21st Mtg. asserts that Plaintiff's allegations of Negligent Hiring, Training, and/or

Supervision of Employees and/or Agents are merely recitations of his TCPA and FDCPA claims which he couches in general terms of negligence and wantonness.

Under Alabama law, in order to sustain a claim for negligent training and supervision or reckless and wanton training and supervision, Mr. Hunt must first establish that an employee of 21st Mtg. committed an actionable common law tort. See Lindsey v. NCO Fin. Sys., Inc., 2:11-CV-03183-WMA, 2012 WL 3999870 (N.D. Ala. Sept. 12, 2012). "To sustain a claim for negligent or wanton hiring or supervision, training and/or retention, 'the plaintiff must establish that the allegedly incompetent employee committed a common-law, Alabama tort.' " Leahey v. Franklin Collection Serv., Inc., 756 F.Supp.2d 1322, 1328–29 (N.D.Ala.2010) (quoting Thrasher v. Ivan Leonard Chevrolet, Inc., 195 F.Supp.2d 1314, 1320 (N.D.Ala.2002); *see also* Thomas v. Util. Trailer Mfg. Co., No. 1:05cv914, 2006 WL 2480057, at *3 (M.D.Ala.2006) and Jackson v. Countrywide Home Loans, Inc., 2:11-CV-327-MEF, 2012 WL 777180 (M.D. Ala. Mar. 7, 2012). In addition, "Alabama law defines 'wantonness' as '[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others.' Ala.Code § 6–11–20(b)(3). ' "Wanton supervision" requires that the employer wantonly disregard its agent's incompetence.' *Armstrong Bus. Servs., Inc. v. AmSouth Bank,* 817 So.2d 665, 682 (Ala.2001)." Shuler v. Ingram & Associates, 441 F. App'x 712, 720-21 (11th Cir. 2011).

Mr. Hunt's claims for negligent, wanton, and/or intentional hiring, retaining or supervising incompetent personnel against 21st Mtg. must fail because there is no evidence, substantial or otherwise, that any 21st Mtg. employee committed an Alabama common-law tort.

In addition, to sufficiently allege a claim of reckless or wanton training or supervision, rather than for negligence, the Plaintiff must demonstrate that 21st Mtg. had actual knowledge of an employee's tortious conduct—a higher bar than negligence's "knew or should have known" standard. *See* Big B, Inc. v. Cottingham, 634 So.2d 999, 1004 (Ala.1993) (distinguishing reckless and wanton training and supervision from negligent training and supervision). Furthermore, wantonness requires actual knowledge by the employer that "injury is likely to result from his act or omission." Id. See also Shuler v. Ingram & Associates, 710 F. Supp. 2d 1213, 1228 (N.D. Ala. 2010) aff'd, 441 F. App'x 712 (11th Cir. 2011). There is no such evidence in this matter.

Mr. Hunt cannot make direct claims against 21st Mtg. for negligent training and supervision or reckless and wanton training and supervision without first establishing an underlying tort. Id.

### IV.   Invasion of Privacy by Intrusion upon Seclusion:

Count IV of Plaintiff's Complaint sets forth a cause of action for "Invasion of Privacy by Intrusion Upon Seclusion." (Doc. 1). Mr. Hunt claims that 21st Mtg.

invaded his privacy by engaging in the following activity:   making numerous telephone calls to Plaintiff's cellular telephone without express permission; using automated and/or predictive dialers, and/or leaving pre-recorded messages in an attempt to harass, annoy, and/or oppress Plaintiff in violation of state and/or federal law; repeatedly and unlawfully attempting to collect a debt;   and intentionally, recklessly, and/or negligently causing emotional harm to Plaintiff by engaging in highly offensive conduct in the course of collecting upon an alleged debt and by repeatedly and unlawfully attempting to collect a debt.  (Doc. 1, ¶¶70-72).

First and foremost, to the extent that Plaintiff's invasion of privacy claim relies upon the allegation that 21st Mtg. used "automated and/or predictive dialers and/or left pre-recorded messages, as previously argued, 21st Mtg. had none of these capabilities.   In addition, to the extent Plaintiff's invasion of privacy claims are premised on violation of State and/or Federal law, as is shown above (TCPA and Negligence) and below (FDCPA), 21st Mtg. did not violated any State or Federal law.

Under Alabama law, the invasion of privacy tort consists of four distinct torts. This Honorable Court recently set out the four torts as follows:

(1) intruding into the plaintiff's physical solitude or seclusion;

(2) giving publicity to private information about the plaintiff that violates ordinary decency;

(3) putting the plaintiff in a false, but not necessarily defamatory, position in the public eye; or

(4) appropriating some element of the plaintiff's personality for commercial use.

Edwards v. Nat'l Vision, Inc., 2:11-CV-01449-WMA, 2013 WL 2249051 (N.D. Ala. May 17, 2013) (internal citations omitted).  Defendant submits that the Plaintiff's Complaint fails to state any claim(s) based on public or commercial use or publication and therefore, has failed to state a claim based on (2) through (4) above.

The law is clear in Alabama that in order for a Plaintiff to sustain a claim for invasion of privacy, he "must show that the defendant's conduct was so outrageous that it caused the plaintiff mental suffering, shame, or humiliation." Baldwin v. Blue Cross/Blue Shield of Alabama, 480 F.3d 1287, 1308-09 (11th Cir. 2007) (citing McIsaac v. WZEW–FM Corp., 495 So.2d 649, 651 (Ala.1986)).  As this Honorable Court recently stated in Deutsche Bank Trust Co. Americas v. Garst, 2:11-CV-04027-WMA, 2013 WL 4851493 (N.D. Ala. Sept. 11, 2013), " 'The tort of invasion of the right of privacy, insofar as it applies to actions of a creditor in regard to his debtor, is the wrongful intrusion into one's private activities in such manner as to outrage or cause mental suffering, shame or humiliation to a person

of ordinary sensibilities.' *Liberty Loan Corp. of Gadsden v. Mizell*, 410 So.2d 45, 47 (Ala.1982) (quotation marks and citations omitted)" Id.

The "narrow, circumscribed reach of the tort of invasion of privacy" is thoroughly discussed in Sparks v. Phillips & Cohen Associates, Ltd., 641 F. Supp. 2d 1234, 1253 (S.D. Ala. 2008):

> Where, as here, there has been no public or commercial use or publication, Alabama courts recognize the tort of invasion of privacy only where "there has been an intrusion upon the plaintiff's physical solitude or seclusion, or a wrongful intrusion into one's private activities in such manner so as to outrage or to cause mental suffering, shame or humiliation to a person of ordinary sensibilities." *I.C.U. Investigations, Inc. v. Jones,* 780 So.2d 685, 689 (Ala.2000) (citations and internal quotations omitted). To constitute a "wrongful intrusion," the defendant's conduct must amount to "intentional interference with another's interest in solitude or seclusion, either as to his person or to his private affairs or concerns." *Myrick v. Barron,* 820 So.2d 81, 85 (Ala.2001) (citation omitted). Examples would include "physical intrusion into a place where the plaintiff has secluded himself, ... discovering the plaintiff's private affairs through wiretapping or eavesdropping, or ... opening private mail or examining a private bank account." *Id.* at 86 (citation omitted). Moreover, invasion of privacy is not established under Alabama law unless the wrongdoer's conduct is "such that would cause mental suffering, shame, or humiliation to a person of ordinary sensibilities." *Sphere Drake Ins., P.L.C. v. Shoney's, Inc.,* 923 F.Supp. 1481, 1490 (M.D.Ala.1996) (quoting *Logan v. Sears, Roebuck & Co.,* 466 So.2d 121, 124 (Ala.1985)); *see also Butler v. Town of Argo,* 871 So.2d 1, 12 (Ala.2003) (same). In the context of debtor-creditor relations, the Alabama Supreme Court has declared that "a creditor has a right to take reasonable action to pursue his debtor and persuade payment, although the steps taken may result to a certain degree in the invasion of the debtor's right to privacy, but that the debtor has a cause of action for injurious conduct on the part of the creditor which exceeds the bounds of reasonableness." *Windsor v. General Motors Acceptance Corp.,* 295 Ala. 80, 323 So.2d 350, 351 (1975) (citation omitted).

Last year, the Eleventh Circuit explained that "a plaintiff in Alabama must show that the defendant's conduct was so outrageous that it caused the plaintiff mental suffering, shame, or humiliation (for invasion of privacy)...." *Baldwin v. Blue Cross/Blue Shield of Alabama,* 480 F.3d 1287, 1308 (11th Cir.2007). In *Baldwin,* the plaintiff presented evidence that her supervisor had routinely used sexually laced profanity in the office; that he had propositioned her to spend the night in his hotel room; that he often called her "babe"; that on one occasion he closed the door to his office and asked her to perform oral sex on him; that he would walk up behind her and breathe on her neck; and that he unzipped his fly in her presence, all of which the plaintiff found offensive and all of which caused her discomfort. Notwithstanding this egregious misconduct, the *Baldwin* panel found no genuine issue of material fact as to the Alabama invasion of privacy cause of action. As that court explained, "[a]ssuming that [the supervisor] did everything that [the plaintiff] said he did, his harassment of [the plaintiff] was not sufficiently outrageous as a matter of Alabama law" to sustain an invasion of privacy claim. *Id.*

Similarly, in *Windsor,* the creditor contacted the debtor, either in person or by telephone, approximately 15–20 times concerning her delinquent payments. The creditor spoke to the debtor's mother (with whom the debtor lived) several times, and would come to the house even after the mother informed the creditor that the **\*1253** plaintiff was not home. The creditor was condescending to the debtor's mother, to the point where after he called she "just went crazy," and on one occasion she even "went to the hospital and stayed there." 323 So.2d at 352. The *Windsor* court found no error in the trial court's granting of a directed verdict in the defendant's favor as to the mother's invasion of privacy claim.

The intrusion of which plaintiffs in this case is far milder than that deemed legally insufficient to constitute an invasion of privacy in *Windsor* and *Baldwin.* Indeed, the sum total of Strine's interactions with plaintiffs consisted of calling Sparks' unlisted home telephone number on one occasion, conducting one 96–second telephone conversation with Ashley that made Ashley and Sparks upset, having one heated telephone conversation with Sparks (that Sparks initiated),

having a single telephone conversation with Peoples about the Glover estate, mailing a statement of claim form to Sparks' office, telling Sparks that defendant had investigated her in some unspecified manner,[26] and making accusations to Sparks that Peoples was intercepting phone messages and that Ashley had impersonated her mother. Such slights may well have been impolite, ill-advised and inappropriate, but they plainly do not rise to the level of an intentional interference with any plaintiff's solitude and seclusion. Even if they did, and even if plaintiffs are correct that Strine had no valid reason to call Sparks' home telephone number in the first place, the Court finds as a matter of law that Strine's actions were not so outrageous as to cause mental suffering, shame, or humiliation to a person of ordinary sensibilities.

In short, plaintiffs' invasion of privacy claims endeavor to stretch the boundaries of that tort far wider than the Alabama Supreme Court has ever done. Having an unlisted home number because one does not wish to be bothered by professional matters while at home is not a guarantee that one will never receive an unwanted business-related call at home. Being 15 years old is not a guarantee that one will never receive an unpleasant or confusing telephone call intended for one's mother. And being a secretary in a law office is not a guarantee that no member of the public will ever call one's boss to voice even unwarranted criticism of one's job performance. Such minor irritations and intrusions are, at most, the sort of inconvenience and nuisance with which every participant in modern-day society must deal on a routine basis. The narrow, circumscribed reach of the tort of invasion of privacy having never been expanded by Alabama courts to embrace such run-of-the-mill slights, this Court will not so dilute it here. Therefore, Defendant's Motions for Summary Judgment are **granted** as to plaintiffs' state-law claims for invasion of privacy.

Sparks v. Phillips & Cohen Associates, Ltd., 641 F. Supp. 2d 1234, 1252-53 (S.D. Ala. 2008).  See also Deutsche Bank Trust Co. Americas v. Garst, 2:11-CV-04027-WMA, 2013 WL 4851493 (N.D. Ala. Sept. 11, 2013) ("the evidence presented in this case is simply too sparse to justify moving the claim beyond summary

judgment"). As in <u>Windsor</u>, <u>Baldwin</u>, <u>Sparks</u> and <u>Garst</u> any alleged conduct on the part of 21[st] Mtg. certainly does not rise to the level of harassment necessary to sustain an invasion of privacy claim under Alabama Law.

In the instant case, Mr. Hunt placed himself as the front man on this loan and took over the responsibility of making payments although not obligated to do so. He initiated contact with 21st Mtg. (Hunt at 22 and Caldwell at 108, Ex. 6 page 97 to Caldwell). He was making payments on the account out of his own personal bank account. (Hunt 22-24). He continued to call 21st Mtg. and make payments. (Hunt at 29-30). He made payments over the telephone on at least thirty occasions beginning in September of 2005 and ending in July of 2011. (EXHIBIT  B, Affidavit of Chris Caldwell and Exhibit 4 thereto). He personally called 21st Mtg. on numerous occasions[8] to make payments. (EXHIBIT  B, Affidavit of Chris Caldwell and Exhibit 4 thereto). He continued making payments until up through July 18, 2011 when he, himself, again called 21st Mtg. to make a payment by check over the phone. (EXHIBIT B, Affidavit of Chris Caldwell and Exhibit 4 thereto).

In addition to his initiated contacts with 21st Mtg., on March 12, 2008, his wife gave 21st Mtg. his telephone number and even told 21st Mtg. to call him. (Caldwell at 121-122, Exhibit 4 to Mr. Caldwell's Affidavit stamped as C. Hunt

---

[8] The Financial Counselor notes, attached to the Affidavit of Chris Caldwell as Exhibit 4, indicate an incoming call in the "Action" column by an entry of the number "6". (Caldwell at 108-109, 123).

87).    The majority, if not all, of the calls to make payments were made by Mr. Hunt from his cellular telephone.  (Hunt at 32).

As far as specific contacts with employees of 21st Mtg., Mr. Hunt could only recall the name of two, Amanda and Kevin.  (Hunt at 68).  He testified that while Amanda's tone of voice was at times really stern, she never made threats, used foul language or anything like that.  (Hunt at 41-42, 44).  While claiming that at times, he had stern conversations with other employees, Mr. Hunt admitted that 21st Mtg. never made any threats.  (Hunt at 41-42, 44, 52, 57-58).  No one from 21st Mtg. ever told Mr. Hunt that he was directly liable for the debt.  (54-55).  Other than one occasion that Mr. Hunt alleges an employee told him to grow up and act like an adult, Mr. Hunt did not consider any other conversation out of line.  (Hunt at 106-107).  No one ever cussed at him or yelled at him.  (Hunt at 107).  He does not believe that anyone from 21st Mtg. ever misled him or provided him with false information.  (Hunt at 175).  No one at 21st Mtg. ever made any threats to Mr. Hunt.  (Hunt at 176).  This evidence hardly rises to the level of invasion of privacy under Alabama law.

Therefore, based on the foregoing, there is no genuine dispute as to any material fact regarding Plaintiff's invasion of privacy claim and 21st Mtg. is entitled to judgment as a matter of law.

**V.    FDCPA 15 U.S.C. § 1692 et seq.**

Count V of Plaintiff's Complaint alleges that 21st Mtg. violated the following sections of the FDCPA, 15 U.S.C. §§ 1692b, 1692c, 1692d, 1692e and 1692f.  (Doc. 1 ; ¶¶ 78-90).

## PLAINTIFF'S FDCPA CLAIMS ARE BARRED BY THE ONE-YEAR STATUTE OF LIMITATIONS

Plaintiff's claims are barred by the FDCPA's one-year statute of limitations. 15 U.S.C.A. § 1692k(d) states the following:

> An action to enforce any liability created by this subchapter may be brought in any appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction, within one year from the date on which the violation occurs.

This suit was not filed until August 14, 2012.  Mr. Hunt admitted that he never talk to anyone at 21st Mtg. after August 12, 2011.  (Hunt at 120-121). Therefore, there being no contact between 21st Mtg. and the Plaintiff, 21st. Mtg. could not have violated the FDCPA in the one-year preceding the filing of this lawsuit.  See e.g., Burdett v. Harrah's Kansas Casino Corp., 294 F. Supp. 2d 1215 (D. Kan. 2003) (One-year statute of limitations had run upon any Fair Debt Collection Practices Act (FDCPA) claim predicated on telephone calls that debt collector had made to consumer's home, where debt collector's last such telephone conversation with consumer occurred more than one year before FDCPA suit).

## THE FDCPA DOES NOT APPLY BECAUSE 21ST MTG. IS NOT A

## "DEBT COLLECTOR" AS DEFINED BY 15 U.S.C. § 1692A(6)

To state a claim under the FDCPA, the Plaintiff must establish, among other things, that the defendant is a "debt collector."   See Reese v. Ellis, Painter, Ratterree & Adams, LLP, 678 F.3d 1211, 1216 (11th Cir.2012). See also,  Birster v. American Home Mortgage Servicing, Inc., No. 11–13574, 2012 WL 2913786 at *3 (11th Cir. July 18, 2012).   The FDCPA's definition of "debt collector" is set forth in §1692a(6).  Defendant asserts that it is not a debt collector because the subject debt was not in default at the time it was acquired.  This Honorable Court recently addressed this very issue in Deutsche Bank Trust Co. Americas v. Garst, 2:11-CV-04027-WMA, 2013 WL 4851493 (N.D. Ala. Sept. 11, 2013):

> The term "debt collector" does not include a person "collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity ... (ii) concerns a debt which was originated by such person [or] (iii) concerns a debt which was not in default at the time it was obtained by such person." § 1692a(6)(F). Put more simply, the FDCPA does not apply to creditors who seek to collect only what is owed them. It only applies to third party debt collectors.

> Under this definition, "a mortgagee and its assignee, including mortgage servicing companies, are not debt collectors under the FDCPA **when the debt is not in default at the time the mortgage-holder acquires the debt.**" *Prickett,* 2013 WL 2248135, at *10 (citing *Perry v. Stewart Title Co.,* 756 F.2d 1197, 1208 (5th Cir.1985)) (emphasis added).

Deutsche Bank Trust Co. Americas v. Garst, 2:11-CV-04027-WMA, 2013 WL 4851493 (N.D. Ala. Sept. 11, 2013).

21st Mtg. is not a "debt collector" because the subject debt was not in default at the time it was obtained.  On or about June 26, 2000, Bradley Faile (Mrs. Hunt's son) entered into a Manufactured Home Retail Installment Contract, Security Agreement and Disclosure Statement (hereinafter "Installment Contract") with Chase Manhattan Bank ("Chase").  (EXHIBIT  B, Affidavit of Chris Caldwell and Exhibit 1 thereto).  Plaintiff's wife, Amelia Hunt f/k/a Amelia Hardiman was a co-signor on the Installment Contract with her son.  (EXHIBIT  B, Affidavit of Chris Caldwell and Exhibit 1 thereto).  The Installment Contract was assigned to Chase Manhattan Bank ("Chase").  (EXHIBIT  B, Affidavit of Chris Caldwell).   In December of 2004, 21st Mtg. Corporation became the servicer and holder of the Installment Contract.  (EXHIBIT  B, Affidavit of Chris Caldwell and Exhibit 2 thereto; Buttram at 67-68).  21st Mtg. began servicing the Installment Contract in January of 2005.  (EXHIBIT  B, Affidavit of Chris Caldwell).  At the time that 21st Mortgage Corporation started servicing the Contract, it was not in default. (EXHIBIT  B, Affidavit of Chris Caldwell and Exhibit 3 thereto).

Since 21st is not a "debt collector" under the FDCPA, it is not subject to the FDCPA and thus, there is no genuine dispute as to any material fact regarding Plaintiff's FDCPA claims and 21st Mtg. is entitled to judgment as a matter of law.

## CONCLUSION

For the reasons stated above, there is no genuine dispute as to any material fact and 21st Mtg. is entitled to judgment as a matter of law.

Respectfully submitted,

_____
DAVID M. WILSON (ASB-1797-N71D)
JAMES E. MITCHELL, JR. (ASB-9127-E62M)
Attorneys for the Defendant
21st Mortgage Corporation

**OF COUNSEL:**
WILSON & BERRYHILL P.C.
One Metroplex Drive
Suite 250
Birmingham, Alabama  35209
Telephone (205) 252-4441
Facsimile (205) 252-0320
david@wilsonberryhill.com
jimmy@wilsonberryhill.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been electronically filed with the Clerk of the Court through the CM/ECF Electronic Filing System, which will generate and serve a Notice of Electronic Filing of the foregoing on the following on this the 6th day of December, 2013:

Wesley Phillips, Esquire
Phillips Law Group, LLC
P.O. Box 362001
Birmingham, Alabama  35236
wlp@wphillipslaw.com
wphillipslaw@gmail.com

Of Counsel: