FILED

2014 Jan-02  PM 03:48
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA SOUTHERN DIVISION

| | | |
|---|---|---|
| **CHARLES HUNT,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.: 12-CV-2697-WMA** |
| | ) | |
| **21st MORTGAGE CORPORATION** | ) | |
| **a Corporation,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Dated: January 2, 2013

Wesley L. Phillips
PHILLIPS LAW GROUP, LLC
Post Office Box 362001
Birmingham, Alabama 35236
Telephone: (205) 383-3585
Facsimile: (800) 536-0385
Email: wlp@phillipslaw.com

**COUNSEL FOR PLAINTIFF
CHARLES HUNT**

TABLE OF CONTENTS

I.   Undisputed Material Facts          ......................................... 4

II.  Plaintiff's Statement of Specifically Disputed and/or Irrelevant Facts
     Given by Defendant          ........................................ 9

III. Argument

     A.   Standard of Review          .................................... 13

     B.   21st Mortgage is Liable to Plaintiff for Violating
          the TCPA          .................................... 14

          1.   Legal Standard       ................................... 14
               a.   Calls           ................................... 15
               b.   Capacity        ................................... 17
               c.   Consent         ................................... 22

          2.   The TCPA is a Remedial Statute       .................. 23

          3.   Spoliation       ................................... 23
               a.   Defendant withheld vital evidence       ....... 24
               b.   21st Mortgage engaged in spoliation
                    of evidence   ................................ 27
               c.   Plaintiff is permanently prejudiced       ....... 28
               d.   Sanctions are warranted  ........................... 30

     C.   21st Mortgage is Liable to Plaintiff for Invasion of Privacy

          1.   Legal Standard       ................................... 32

          2.   Plaintiff's Claims  ................................... 34

          3.   Cases Relied Upon by Defendant       .................. 34

          4.   The Facts in This Case are Egregious  .................. 38

      a.     Defendant hounded Plaintiff on His Cellular Telephone ......................................... 39

      b.     Defendant Ridiculed Plaintiff when Calling Him on His Cellular Telephone ............................. 41

      c.     21st Mortgage Skip Traced for Charlie Hunt's Relatives and Neighbors .............................. 42

D.    21st Mortgage is Liable to Plaintiff for Its Negligence or Wantonness ............................................. 43

E.    21st Mortgage is Liable to Plaintiff for the Actions of Its Employees ............................................. 49

F.    Fair Debt Collection Practices Act Claims ................... 55

## EXHIBIT LIST

Exhibit A        Deposition of Walden Buttram

Exhibit B        Call Notes Produced by 21st Mortgage, p. C Hunt 97

Exhibit C        Call Notes Produced by 21st Mortgage, p. C Hunt 90

Exhibit D        Call Notes Produced by 21st Mortgage, pp. C. Hunt 35 - C. Hunt 87

Exhibit E        Potential Liabilities Policy for 21st Mortgage

Exhibit F        Do Not Call Letter from Charles & Amelia Hunt

COMES NOW Plaintiff Charles Hunt and hereby responds in opposition to Defendant 21st Mortgage Corporation's motion for summary judgment, and as grounds therefore, states and shows the Court the following:

## I.   Undisputed Material Facts

Plaintiff Charles Hunt was not the debtor for the loan for which Defendant 21st Mortgage Corporation was attempting to collect[1].  In fact, Charles Hunt had no contractual relationship with 21st Mortgage and 21st Mortgage had knowledge the entire time it was contacting him he had no liability for the debt it was calling his cellular telephone attempting to collect[2].  At the time 21st Mortgage began contacting him, Mr. Hunt was merely the boyfriend of Amelia Hunt, a co-debtor on the loan 21st Mortgage Corporation was servicing[3].  21st Mortgage began calling Mr. Hunt on his cellular telephone demanding to know when he was going to make a payment on the debt[4].  He told the collectors from 21st Mortgage it was not his debt and not to call him on his cellular telephone, yet 21st Mortgage ignored his requests and continuously called him on his cellular telephone[5].

[1]See Doc. 44-1, Contract

[2]See Doc. 44-2 (Caldwell Depo. Tr.) at 137:10-23.

[3]See Doc. 44-3 (Hunt Depo. Tr.) at 36:-15-37:3.

[4]See Doc. 44-3 (Hunt Depo. Tr.) at 19:23-20:5; 22:1-13.

[5]See Docs. 44-3, 4 (Hunt Depo. Tr.) at 53:20-54:22.

When calling Mr. Hunt on his cellular telephone, 21st Mortgage's collectors would hound Charles Hunt and became more demanding over time[6]. 21st Mortgage made numerous calls to Charles Hunt since August, 2008 regarding the account for which he was not responsible and on a contract to which he was not a party[7]. Mr. Hunt, who was often working when he received collection calls from 21st Mortgage, became very upset that 21st Mortgage continuously called him on his cellular telephone[8]. 21st Mortgage began calling him several times a day on his cellular telephone about a debt for which he had no liability[9].

21st Mortgage knew Charles Hunt had no liability on the alleged debt it was attempting to collect from him[10]. Mr. Hunt even told 21st Mortgage to call the home phone for Amelia Hunt if they wanted to discuss payment arrangements with someone[11]. On one occasion, the collector calling Charles Hunt on his cellular

---

[6]*See* Doc 44-3 (Hunt Depo. Tr.) at 39:16-40:14.

[7]*See* Docs. 47-1; 47-2, Revised Affidavit of Charles Hunt, Exhibit A, Summary of Calls from 21st Mortgage; *See* Pl. Ex. D., Call Notes Produced by 21st Mortgage, pp. C. Hunt 35 - C. Hunt 87, each #7 called.

[8]*See* Docs. 44-3, 44-4 (Hunt Depo. Tr.) at 53:20-54:22.

[9]*See* Doc. 44-4 (Hunt Depo. Tr.) at 64:3-11.

[10]*See* Doc. 44-2 (Caldwell Depo. Tr.) at 137:10-23.

[11]*See* Doc 44-4 (Hunt Depo. Tr.) at 54:12-17.

telephone told him to "grow up and act like an adult[12]."  This infuriated Mr. Hunt[13]. The collectors of 21st Mortgage would often play a game of "good cop, bad cop" with Mr. Hunt when calling to collect a debt he did not owe[14].  21st Mortgage constantly called him on his cellular telephone while he was at work as well as on the weekends[15].  One collector, Kevin Bunch, asked Mr. Hunt how much money he was being paid on a weekly basis and wanted Mr. Hunt to make two payments on a debt he did not owe[16].

21st Mortgage continued to call Mr. Hunt on his cellular telephone regardless of his pleas for 21st Mortgage to stop doing so[17].  21st Mortgage's collectors calling Charles Hunt after his *verbal* instruction not to call violated *21st Mortgage's own policies[18]*.  21st Mortgage refused to stop calling Mr. Hunt on his cellular telephone about a debt he did not owe even after he sent it a written letter instructing it to stop

---

[12]*See* Doc. 44-4 (Hunt Depo. Tr.) at 78:19-79:12.

[13]*See* Doc. 44-4 (Hunt Depo. Tr.) at 79:9-12.

[14]*See* Doc. 44-3 (Hunt Depo. Tr.) at 42:4-21.

[15]*See* Doc. 44-4 (Hunt Depo. Tr.) at 107:17-109:9.

[16]*See* Doc. 44-5 (Hunt Depo. Tr.) at 168:18-169:5.

[17]*See* Doc. 44-4 (Hunt Depo. Tr.) at 106:4-11.

[18]*See* Pl. Ex E, Potential Liabilities, #6 - Stop Calling; Doc 44-15, 21st Mortgage Corporation's Prohibited Collection Practices.

calling his cellular telephone[19]. 21st Mortgage continued to call Mr. Hunt's cellular telephone even after receiving the letter[20].    Defendant 21st Mortgage admitted it violated its own policies when collectors continued to call Charles Hunt after it received written notice to stop calling on August 12, 2011[21].  In addition to calling Mr. Hunt, 21st Mortgage contacted his elderly mother, his sister in Mobile, his ex-wife, and his daughter[22].  The  telephone calls to Mr. Hunt's family, ex-wife and neighbors about a debt he did not owe caused him embarrassment and humiliation[23].  21st Mortgage called Charles Hunt's ex-wife, Joy, with whom he had not spoken to in years about a debt he did not owe[24].  Kevin, a collector with 21st Mortgage, called Mr. Hunt's mother in Atlanta and greatly upset her[25]. Even the corporate representative of 21st Mortgage agreed that calling Mr. Hunt's relatives, such as his ex-wife, could be

---

[19]*See* Doc. 44-4 (Hunt Depo. Tr.) at 112:22-113:16; Exhibit F, Do Not Call Letter.

[20]*See* Doc. 44-5 (Hunt Depo. Tr.) at 121:7-13; Doc. 47-1, Revised Affidavit of Charles Hunt; Doc. 47-2, Exhibit A, Summary of Calls from 21st Mortgage.

[21]*See* Doc. 44-2 (Caldwell Depo. Tr.) at 231:19-234:2.

[22]*See* Doc. 44-4 (Hunt Depo. Tr.) at 69:1-71:11; Doc. 44-9, Affidavit of Lauren Randall; Doc. 44-10, Affidavit of Mary Honkanen.

[23]*See* Doc. 44-4 (Hunt Depo. Tr.) at 70:3-6.

[24]*See* Doc. 44-5 (Hunt Depo. Tr.) at 167:22-168:8.

[25]*See* Doc. 44-4 (Hunt Depo. Tr.) at 71:23-74:22.

construed as harassment[26]. Mr. Hunt testified that the stress of 21st Mortgage constantly calling his cellular telephone about a debt he did not owe not only caused him health issues, like not sleeping, headaches and upset stomach, it almost caused him and Amelia Hunt to divorce[27].

21st Mortgage provides its employees <u>no</u> training to ensure compliance with the Telephone Consumer Protection Act ("TCPA")[28]. Further, 21st Mortgage has <u>no</u> procedures in place to ensure compliance with the TCPA[29]. Moreover, 21st Mortgage makes <u>no</u> effort to distinguish whether the numbers it captures from persons calling it or skip traces through Accurint are land lines or cellular telephone numbers[30]. Defendant 21st Mortgage's operations are inconsistent with its claims that it does not employ a automated telephone dialing system ("ATDS")[31]. Plaintiff's Expert, Robert Biggerstaff, states from what he could observe from the offline telephone system, it is his opinion the equipment employed by 21st Mortgage to call Charles Hunt's

---

[26]*See* Doc. 44-2 (Caldwell Depo. Tr.) at 247:13-248:2.

[27]*See* Doc. 44-5 (Hunt Depo. Tr.) at 149:15-150:5.

[28]*See* Doc. 44-2 (Caldwell Depo. Tr.) at 160:14-23.

[29]*See* Doc. 44-2 (Caldwell Depo. Tr.) at 182:11-13.

[30]*See* Doc. 12-3, p.8, Nos. 21-22; Doc. 44-2 (Caldwell Depo. Tr.) at 202:17-25.

[31]*See* Doc. 44-11, Expert Report of Robert Biggerstaff, p. 4, ¶¶2-3.

cellular telephone <u>did</u> have the capacity to autodial telephone numbers[32].  Further, the actions of the employees of 21st Mortgage in addition to its exceptionally efficient operations and industry standards of its competitors are inconsistent with its claims of manually dialing telephone numbers[33].

## II.   Plaintiff's Statement of Specifically Disputed and/or Irrelevant Facts Given by Defendant

Mr. Hunt was the boyfriend of Amelia Hunt in 2006, and in an effort to assist her, agreed to make a payment on her loan the first time he called 21st Mortgage to make a payment on her behalf[34].  21st Mortgage states that Charles Hunt called them first on September 30, 2005 to make a payment[35].  What Defendant conveniently omits from this statement is that the first telephone call from Mr. Hunt to 21st Mortgage on September 30, 2005 to make a payment for his girlfriend was *from a landline* as stated in 21st Mortgage's own call notes and is not relevant to this lawsuit[36]. The same is true for the July 24, 2007 call by Charles Hunt[37].

---

[32]*See* Doc. 44-11, Expert Report of Robert Biggerstaff, pp. 10-11, ¶27.

[33]*See* Doc. 44-11, Expert Report of Robert Biggerstaff, pp. 9-10, ¶¶22-26; p. 11, ¶28-29.

[34]*See* Doc 44-3 (Hunt Depo. Tr.) at 36:-15-37:3.

[35]*See* Doc. 43-1, p. 3, No. 5.

[36]*See* Pl. Ex. B, Call Notes Produced by 21st Mortgage, p. C Hunt 97

[37]*See* Pl. Ex. C, Call Notes produced by 21st Mortgage, p. C Hunt 90

Charles Hunt never gave 21st Mortgage permission to call his cellular telephone[38]. There is no evidence Mr. Hunt ever gave anyone at 21st Mortgage permission to call his cellular telephone[39]. To the contrary, he continually told 21st Mortgage to stop calling him on his cellular telephone[40]. 21st Mortgage, unbeknownst to Mr. Hunt, "captured" and "logged in" his cellular telephone number when he called in to make a payment for his then girlfriend, Amelia Hunt[41].

Defendant then embarked on a campaign of continuously calling his cellular telephone wanting to know when he would make another payment as is reflected by 21st Mortgage's own call notes[42]. This continued even after Mr. Hunt instructed 21st Mortgage to stop calling him, a non-debtor, on his cellular telephone[43]. 21st Mortgage completely misleads the Court in stating that it made only three (3) calls to Mr. Hunt. 21st Mortgage's own records show this statement is false[44]. Chris Caldwell, the

---

[38]*See* Doc 44-2 (C. Caldwell Depo Tr.) at 128:2-136:14; Docs. 44-3; 44-4 (Hunt Depo. Tr.) at 53:20-54:22; 96:12-21; 106:4-11.

[39]*Id.*

[40]*See* Docs. 44-3; 44-4 (Hunt Depo. Tr.) at 53:20-54:22; 96:12-21; 106:4-11.

[41]*See* Doc 44-2 (C. Caldwell Depo Tr.) at 126:9-128:1.

[42]*See* Pl. Ex. D., Call Notes Produced by 21st Mortgage, pp. C. Hunt 35 - C. Hunt 87, each #7 called.

[43]*See* Docs. 44-3; 44-4 (Hunt Depo. Tr.) at 53:20-54:22; 96:12-21; 106:4-11.

[44]*See* Pl. Ex. D., Call Notes Produced by 21st Mortgage, pp. C. Hunt 35 - C. Hunt 87, each #7 called.

corporate representative for 21st Mortgage, and Walden Buttram both testified that the number listed as "#7" in 21st Mortgage's call logs was the cellular telephone  of Charles Hunt "captured" by 21st Mortgage when he called[45].   The call notes bear out Buttram's testimony.

On page eighty-seven (87) on 03/12/08 at 7:03 pm, the call notes state "Charles called in from 770-231-1071[46]." That is when Charles Hunt's cellular phone number was captured by 21st Mortgage.  Then on page eighty-five (85) the call notes state on both 06/06/2008 and 7/22/08 Charles Hunt called in to make payments on his girlfriend's loan[47].  After that, each notation in the call notes that notate a "#7" being called are calls by 21st Mortgage to the cellular telephone of Charles Hunt that was being called at the relevant times in this case[48].   The call notes *produced by 21st Mortgage* show that telephone "#7" was called *approximately 150 times* between August, 2008 and August, 2011[49].  There was even a span of one month from June 8,

_____

[45]*See* Doc 44-2 (C. Caldwell Depo Tr.) at 133:6-134:15; Pl. Ex. A (Buttram Depo Tr.) at 61:22-65:2.

[46]*See* Pl. Ex. D., Call Notes Produced by 21st Mortgage, pp. C. Hunt 35 - C. Hunt 87, p. C. Hunt 87.

[47]*See* Pl. Ex. D., Call Notes Produced by 21st Mortgage, pp. C. Hunt 35 - C. Hunt 87.

[48]*See* Pl. Ex. A (Buttram Depo Tr.) at 61:22-65:2.

[49]*See* Pl. Ex. D., Call Notes Produced by 21st Mortgage, pp. C. Hunt 35 - C. Hunt 87, each "#7".

2011 through July 8, 2011 that 21st Mortgage called Mr. Hunt's cellular telephone number twenty-five (25) times[50].

Contrary to Defendant's assertion, there is more than one number at issue in this matter[51]. Charles Hunt testified he is making claims not only for the calls made to him, but also for the calls made to his relatives (mother, daughter, sister, etc.), friends, and neighbors[52]. The letter sent to 21st Mortgage directing it to stop calling Charles Hunt's cellular telephone was drafted by Charles Hunt and then written and mailed to 21st Mortgage by his wife, Amelia Hunt[53]. Charles Hunt's telephone number was clearly and conspicuously stated in the letter directing 21st Mortgage to stop calling his cellular telephone[54]. Yet,21st Mortgage continued to call his cellular telephone after receipt of the letter *in violation of its own policies and procedures*[55].

---

[50]*See* Pl. Ex. D., Call Notes Produced by 21st Mortgage, pp. C. Hunt 44 - C. Hunt 45, each "#7".

[51]*See* Doc. 43-1, p. 4.

[52]*See* Doc. 44-3 (Hunt Depo. Tr.) at 18:15-19:16.

[53]*See* Doc. 44-5 (Hunt Depo Tr.) at 119:9-120:22.

[54]*Id.*

[55]*See* Doc. 44-5 (Hunt Depo Tr.) at 121:7-13; Doc 44-2 (C. Caldwell Depo Tr.) at 230:20-234:2; Pl. Ex. D., Call Notes Produced by 21st Mortgage, pp. C. Hunt 35 - C. Hunt 87; Doc. 44-16, Do Not Call Policy; Doc. 44-15, Prohibited Collection Practices; Pl. Ex. E, Potential Liabilities.

21st Mortgage's own Administrator of Information Technology stated that the telephone equipment used by 21st Mortgage to call Mr. Hunt's cellular telephone had the capacity to autodial telephone numbers if the software was installed[56].  Due to Defendant's spoliation of the telephone system in use when the subject calls were made to Charles Hunt, Plaintiff's expert, Robert Biggerstaff, had to observe the system in an offline state[57].  However, expert Robert Biggerstaff concluded after reviewing the complex and sophisticated systems employed by 21st Mortgage that at the time of the calls made to Mr. Hunt, the telephone system used by Defendant did have the *present capacity* to autodial telephone numbers[58].

## III.   Argument

### A.   Standard of Review

"[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  In considering the party's motion for summary judgement, the court must examine all evidence in the light most favorable to the

---

[56]*See* Doc. 29-1, Deposition of Jim Collins, Network Administrator for 21st Mortgage Corporation, 28:8-29:21.

[57]*See* Doc. 44-11, Expert Report of Robert Biggerstaff, p. 6, ¶13.; p. 7, ¶16.

[58]*See* Doc. 44-11, Expert Report of Robert Biggerstaff, pp. 10-11, ¶27.

non-moving party. *Barber v. General Elec. Co.*, 648 F.2d 1272, 1276 n. 1 (10th Cir.1981) (*citing U.S. v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).   "[T]he issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968).

      B.      21st Mortgage is Liable to Plaintiff for Violating the TCPA

          1.      Legal Standard

The three elements of a TCPA claim are: (1) the defendant called a cellular telephone number; (2) using an automatic telephone dialing system; (3) without the recipient's prior express consent. *Meyer v. Portfolio Recovery Associates, LLC*, 696 F.3d 943, 949 (9th Cir. 2012) *citing* 47 U.S.C. § 227(b)(1).   "The term 'automatic telephone dialing system' means 'equipment that has the capacity— (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers.'" *Id*. *citing* 47 U.S.C. § 227(a)(1).   **"PRA** argues that its dialers do not have the *present capacity* to store or produce numbers using a random or sequential number generator. As we explained in *Satterfield v.*

*Simon & Schuster, Inc.*, the clear language of the TCPA 'mandates that the focus must be on whether the equipment has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator.'" *Id.* (internal cites omitted) (emphasis added).

        a.     Calls

It is undisputed that 21st Mortgage called Mr. Hunt on his cellular telephone numerous times[59]. Chris Caldwell, the corporate representative for 21st Mortgage, and Walden Buttram both testified that the number listed as "#7" in 21st Mortgage's call logs was the cellular telephone of Charles Hunt "captured" by 21st Mortgage when he called[60]. The call notes produced by 21st Mortgage show that Mr. Hunt's cellular telephone number was called approximately *150 times* between August, 2008 and August, 2011[61]. Mr. Hunt never gave his express consent to being called on his cellular telephone[62]. He merely called 21st Mortgage to make a payment to help out

---

[59]*See* Doc 44-2 (Caldwell Depo Tr.) at 133:6-134:15; Pl. Ex. A (Buttram Depo Tr.) at 61:22-65:2; *See* Doc 47-1, Revised Affidavit of Charles Hunt; Doc. 47-2, Exhibit A, Summary of Calls from 21st Mortgage; Pl. Ex. D., Call Notes Produced by 21st Mortgage, pp. C. Hunt 35 - C. Hunt 87.

[60]*See* Doc 44-2 (C. Caldwell Depo Tr.) at 133:6-134:15; Pl. Ex. A (Buttram Depo Tr.) at 61:22-65:2.

[61]*See* Pl. Ex. D., Call Notes Produced by 21st Mortgage, pp. C. Hunt 35 - C. Hunt 87, each "#7".

[62]*See* Doc 44-2 (Caldwell Depo Tr.) at 128:2-136:14.

his then girlfriend, Amelia Hayes[63].

When Charles Hunt called in the mortgage payment out of kindness to his girlfriend 21st Mortgage captured his cellular telephone number and began contacting him on his cellular telephone as it did for <u>anyone</u> who calls, including a child, it about an account it collects[64].  In fact, Mr. Hunt testified over and over that he did <u>not</u> give his consent for 21st Mortgage to call his cellular telephone and repeatedly told the collectors from 21st Mortgage not to call his cellular telephone[65].  This was a violation of 21st Mortgage's own polices and procedures[66].

Charles Hunt even sent a letter to 21st Mortgage telling it stop calling his cellular telephone, which was ignored by 21st Mortgage as it continued to call his cellular telephone *also violating* 21st Mortgage's policies and procedures[67].  There is no legitimate question that 21st Mortgage made numerous calls to Charles Hunt's cellular telephone from August 2008 to August 2011, even if the review is limited to

---

[63]*See* Docs. 44-3; 44-4 (Hunt Depo. Tr.) at 22:1-19; Docs. 44-3; 44-4 (Hunt Depo. Tr.) at 53:20-54:22; 96:12-21; 106:4-11.

[64]*See* Doc. 44-2 (Caldwell Depo. Tr.) at 127:11-128:1; 126:9-18; 211:5-213:1.

[65]*See* Docs. 44-3; 44-4 (Hunt Depo. Tr.) at 53:20-54:22; 96:12-21; 106:4-11.

[66]*See* Doc. 44-15, 21st Mortgage Corporation's Prohibited Collection Practices.

[67]*See* Doc. 44-4 at 112:22-113:16; Doc 44-2 (C. Caldwell Depo Tr.) at 230:20-234:2.

21st Mortgage's own call notes[68].

> b.    Capacity

The code section enacting the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §227(a) states in relevant part,

> (1) The term "automatic telephone dialing system" means equipment which has the *capacity*—
> (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and
> (B) to dial such numbers.
> 47 U.S.C. §227(a) [emphasis added].

The plain reading of the statute focuses on the "capacity" of the equipment rather than whether or not certain functions of the equipment, such as auto dialing, were actually used by the entity using the equipment to call consumers.  The FCC has also focused on this issue stating the equipment "need only have the '*capacity* to store or produce telephone numbers (emphasis added) * * *'" when engaging in its rulemaking function as arbiter of the TCPA.  *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278 Report and Order, 18 FCC Rcd 14014, 14092, para. 133 (2003) (*2003 TCPA Order*) [emphasis in original].   The question of whether the equipment is an automated dialing system is a question of fact. *Buslepp v. B&B Entertainment*, LLC, CV-12-60089, S.D. Fla

---

[68]*See* Pl. Ex. D., Call Notes Produced by 21st Mortgage, pp. C. Hunt 35 - C. Hunt 87, each #7 called

(May 3, 2012) *citing Satterfiled v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009).

The testimony of Jim Collins, the person who handles the day-to-day IT functions of Defendant stated in his deposition that the equipment that was in use at all relevant times in this matter *did* have the "capacity" to make autodialed telephone calls with software[69]. Defendant 21st Mortgage is claiming that since it did not install certain software in its mainframe, a question to which we will never have the answer due to Defendant engaging in spoliation, the mainframe was not an autodialer. However, that is not what the statute, FCC rulings, and case law bear out with respect to telephone equipment and the TCPA.

The "equipment" was the Nortel CS1000 mainframe server to which the five hundred (500) dummy telephone modules were attached[70] not the dummy telephone module alone Defendant brought to the deposition, produced manuals for in discovery[71], and brought to the chambers of this Honorable Court that Defendant has been claiming since the inception of this lawsuit and has represented to Plaintiff and

---

[69]*See* Doc. 29-1, Deposition of Jim Collins, Network Administrator for 21st Mortgage Corporation, 28:8-29:21.

[70]*See* Doc. 29-1, Deposition of Jim Collins, Network Administrator for 21st Mortgage Corporation, 21:2- 21:8.

[71]Defendant did <u>not</u> provide any information about the mainframe server through Plaintiff's Interrogatories and Request for Production, although he requested them.

the Court was the only telephone system in use at all relevant times in this matter. This is clearly not true as Plaintiff learned from Defendant's Network Administrator at deposition.

The seminal case on "equipment" and "capacity" as these terms relate to the TCPA is *Satterfiled v. Simon & Schuster, Inc.*, 569 F.3d 946, 952 (9th Cir. 2009). In *Satterfield*, the District Court granted summary judgment to the Defendant and the Ninth Circuit Court of Appeals reversed the judgment stating in pertinent part,

> The district court focused its analysis on whether the equipment used by Simon & Schuster stored, produced, or called numbers "using a random or sequential number generator." The district court even noted that "the parties' dispute centers on the phrase 'using a random or sequential number generator.'" With this as its focus, the district court held that "the equipment here does not store, produce or call randomly or sequentially generated telephone numbers, the Court grants summary judgment in the Defendants' favor: the equipment at issue is not an automatic telephone dialing system under the TCPA." We find that the district court focused its analysis on the <u>wrong</u> <u>issue</u> in its determination of what constitutes an ATDS.
> *Satterfiled v. Simon & Schuster, Inc.*, 569 F.3d at 950-51 [emphasis added].

The Ninth Circuit relied upon the principles of statutory construction to determine the proper method for evaluating when equipment is an autodialer, stating in relevant part as follows:

> When evaluating the issue of whether equipment is an ATDS, the statute's clear language mandates that the focus must be on whether the equipment has the capacity "to store or produce telephone numbers to be called, using a random or sequential number generator." Accordingly, <u>a system need not actually store, produce, or call</u> randomly or sequentially generated telephone numbers, it need only have the capacity to do it.

*Satterfiled v. Simon & Schuster, Inc.*, 569 F.3d at 951 [emphasis added].

Three years after *Satterfield* was decided, the Ninth Circuit again had reason to

elaborate upon its holding in *Satterfield* in the case of *Meyer v. Portfolio Recovery*

*Associates, LLC*, 707 F.3d 1036 (9th Cir. 2012).

In *Meyer*, another Defendant, PRA, claimed it was not subject to the TCPA.

"PRA argues that its dialers do not have the present capacity to store or produce

numbers using a random or sequential number generator." *Meyer v. Portfolio*

*Recovery Associates, LLC*, 707 F.3d at 1043. However, the Ninth Circuit again

clarified that the Defendants were using the wrong standard in claiming they were not

subject to the TCPA stating, "As we explained in *Satterfield v. Simon & Schuster,*

*Inc.*, the clear language of the TCPA 'mandates that the focus must be on whether the

equipment has the capacity 'to store or produce telephone numbers to be called, using

a random or sequential number generator...' '([A] system need <u>not</u> actually store,

produce, or call randomly or sequentially generated telephone numbers, it need only

have the capacity to do it.')." *Id*. [emphasis supplied].

Other cases have also held that the issue is equipment capacity rather than its

actual use. *See Blair v. The CBE Group Incorporated*, No. 13-CV-134-MMA, p. 6,

Dist. Court. S.D. Cal (May 13, 2013) ("the issue is not whether CBE Group *used* an

ATDS, but whether its equipment had the requisite *capacity*.")[emphasis in original];

*Lozano v. Twentieth Century Fox Film Corp.*, 702 F.Supp.2d 999, 1010 (N.D.Ill. 2010) ("Congress included a definition that provides that in order to qualify as an automatic telephone dialing system, the equipment need only have the capacity to store or produce numbers. ('[A] system need not actually store, produce or call randomly or sequentially generated telephone numbers, it only need to have the capacity to do it')")[internal cites omitted]. Jim Collins, Network Administrator for 21st Mortgage, stated that the CS1000 mainframe server used by Defendant during all time periods relevant to the case at bar had the capability to automatically dial telephone numbers with software[72]. Expert Robert Biggerstaff reviewed 21st Mortgage's equipment in its spoliated state. Based upon his review of the sophisticated and complex systems employed by 21st Mortgage along with the incongruencies of the ergonomics he was personally allowed to view, Mr. Biggerstaff opined it is his expert opinion that 21st Mortgage's equipment *did have the present capacity* to autodial telephone numbers when the subject telephone calls were made to Charles Hunt[73]. As stated below, 21st Mortgage engaged in spoliation in this matter which clearly and obviously prejudiced Plaintiff in proving his case. At the very least,

---

[72]*See* Doc. 29-1, Deposition of Jim Collins, Network Administrator for 21st Mortgage Corporation, 29:13-29:21.

[73]*See* Doc. 44-11, Expert Report of Robert Biggerstaff, p. 6, ¶13.; p. 7, ¶16; pp. 10-11, ¶27.

the question of capacity or present capacity should be left up to a jury decide in this matter.

           c.     Consent

The burden of proof is on defendant to establish that plaintiff expressly consented to be contacted at his cellular telephone number. *See In re: Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 F.C.C.R. 559, 564–65 ¶ 10 (F.C.C. Jan. 4, 2008); *see also Mais v. Gulf Coast Collection Bureau, Inc.*,944 F.Supp.2d 1226, 1233 (S.D.Fla. May 8, 2013), *cert. granted* (June 10, 2013)*; Manfred v. Bennett Law, PLLC*, 2012 WL 6102071, at *2 (S.D.Fla. Dec. 7, 2012) (Seitz, J.) ("prior express consent is an affirmative defense" under TCPA); *Frausto v. IC System, Inc.*, 2011 WL 3704249 at *2 (N.D.Ill. Aug. 22, 2011).

Charles Hunt never consented to being called on his cellular telephone by 21st Mortgage.  It is undisputed that Charles Hunt never gave Defendant his "express consent" to being called on his cellular telephone as required by the TCPA prior to being hounded by Defendant for a debt he did not owe[74].   Assuming *arguendo*, it could be said he "impliedly" consented for a period of time in 2005-2007, by August

---

[74]*See* Doc. 44-2 (Caldwell Depo Tr.) at 135:18-136-14.

2008, he had instructed Defendant to stop calling him on his cellular telephone[75].

Even if he did not affirmatively state he did not consent to the calls at first, which the

TCPA does not require, once 21st Mortgage began hounding him about when he was

going to make a payment on a debt he did not owe, he repeatedly told 21st Mortgage

to stop calling his cellular telephone[76].  However, in any event, there is no evidence

Charles Hunt ever gave 21st Mortgage the "express consent" required by the TCPA

to be called on his cellular telephone.  Thus, Plaintiff has met his burden of showing

there was no "prior express consent" to call his cellular telephone as required by the

TCPA.

2.    The TCPA is a Remedial Statute

The TCPA is a remedial statute and thus entitled to a broad construction. *See,*

*e.g., Holmes v. Back Doctors, Ltd.* , 695 F.Supp.2d 843, 854 (S.D. Ill. 2010); *see also*

*Gager v. Dell Financial Services, LLC*, 12-2823, p. 9, (3rd Cir. August 22, 2013).  As

such, it "should be liberally construed and should be interpreted in a manner tending

to discourage attempted evasions by wrongdoers." *Scarborough v. Atlantic Coast Line*

*R. Co.* , 178 F.2d 253, 258 (4th Cir. 1950).  "[A] remedial statute should be liberally

and beneficently construed." *Dennis v. Higgins*, 498 U.S. 439, 443, 111 S.Ct. 865,

---

[75]See Docs. 44-3; 44-4 (Hunt Depo. Tr.) at 53:20-54:22; 96:12-21; 106:4-11.

[76]*Id.*

868, 112 L.Ed.2d 969 (1991). "As a remedial statute, [the TCPA like TILA] must be construed liberally in favor of the consumer. *Ellis v. Gen. Motors Acceptance Corp.*, 160 F.3d 703, 707 (11th Cir. 1998). It is clear from the case law expounding upon the TCPA it is a remedial statute and is to be read broadly in favor of finding consumer protection from the prohibitions found in the TCPA.

        3.     Spoliation

            a.     Defendant withheld vital evidence

Defendant 21st Mortgage concealed from Plaintiff and the Court throughout the time allotted for discovery the fact there was more equipment other than the dummy telephone module it produced in its Initial Disclosures and in response to Plaintiff's Interrogatories and Requests for Production[77]. Defendant stated in its Initial Disclosures, particularly in 26(a)(1)(B)(2), the equipment that made up its telephone system consisted of the dummy telephone module units it has presented to Plaintiff and the Court as its <u>entire</u> telephone system[78]. Defendant has withheld, until Plaintiff learned at the deposition of its Network Administrator, the vitally important fact there was a mainframe server in place that actually controlled Defendant's telephone system.

---

[77]*See* Doc. 29-2, Initial Disclosures of Defendant 21st Mortgage; *See also* Doc. 12-3.

[78]*See* Doc. 29-2, Initial Disclosures of Defendant 21st Mortgage.

Defendant has not only engaged in spoliation of evidence it has intentionally withheld vital evidence from Plaintiff throughout discovery in this matter. Defendant's Network Administrator, Jim Collins, revealed for the first time at deposition that the dummy telephone modules were not an integral part of Defendant's telephone system contrary to what Defendant has represented to Plaintiff and the Court since the inception of the instant lawsuit[79]. Defendant was asked in two separate discovery requests to provide Plaintiff with information on all components of its telephone system, yet Defendant has willfully and inexcusably withheld this vital information from Plaintiff. In Plaintiff's Interrogatory numbered nineteen(19), he requested the following information:

> **19.    Identify all machines by model, supporting system and dates/time used that were used to make any telephone call in connection with plaintiff, including calls to Plaintiff's husband, friends, and relatives.**
> **RESPONSE:**

To which Defendant responded[80],

> **Defendant objects to this interrogatory as it is not reasonably calculated to lead to the discovery of admissible evidence. Further, Defendant does not know the identity of Plaintiffs husband, friends or relatives (with the exception of his wife, Amelia Hunt) and therefore cannot appropriately respond to this interrogatory. However, without waiving any objection contained herein, at all relevant times, Defendant utilized the Nortel Meridian Modular Telephone system. Please refer to the Nortel Meridian**

---

[79]*See* Doc. 29-1, Deposition of Jim Collins, Network Administrator for 21st Mortgage Corporation, 34:21-35:9.

[80]*See* Doc. 12-3, pp. 7-8.

Modular Telephone user manual, a copy of which was attached to Defendant's initial disclosures and stamped C. HUNT 1 through 26.

Further, in Plaintiff's Request for Production numbered fourteen (14), Plaintiff requested:

**14.     Produce any and all users manuals and technical manuals for the phone systems, both hardware and software, utilized by Defendant to make the telephone calls at issue in this matter**.

To which Defendant 21st Mortgage responded as follows[81]:

**See the Nortel Meridian Modular Telephone user manual, a [sic] produced along with Defendants initial disclosures (stamped C. HUNT 1 through 26).**

At deposition, Jim Collins admitted there was another key component to this system, the mainframe that runs the entire system[82].  The mainframe is the "brain" of the entire phone system and the "Nortel Meridian Modular Telephones" are just "dummy units" that have no capabilities without being connected the "brain" that is the mainframe[83].  Defendant has purposefully, willfully, and intentionally withheld this vital piece of discoverable evidence from Plaintiff.  Whether it is termed a "machine" or a "supporting system" it is a highly relevant and vital piece of

---

[81]*See* Doc. 12-3, p 16.

[82]*See* Doc. 29-1, Deposition of Jim Collins, Network Administrator for 21st Mortgage Corporation, 28:16-23.

[83]*Id*. at 32:22-32:24.

discoverable information that 21ˢᵗ Mortgage has purposefully withheld from Plaintiff. There can be no doubt Plaintiff has been extremely prejudiced by the withholding of this vital piece of information.

> b.     21ˢᵗ Mortgage engaged in spoliation of evidence

Jim Collins stated at deposition he was never instructed to put a litigation hold on the telephone system at issue, although Defendant knew it was the subject of ongoing litigation at the time the telephone system was replaced[84]. Jim Collins as Network Administrator was the person responsible for switching out the telephone system and was the one who should have been instructed to place a litigation hold on the system, but Defendant intentionally did not do so even with the knowledge of ongoing litigation involving the subject telephone system[85]. Jim Collins, the person Defendant should have notified to put a litigation hold on the telephone system while it was "live" did not even know about the instant litigation until the week of his deposition[86].

Spoliation refers to the destruction of evidence or the significant and meaningful alteration of a document or instrument. *Green Leaf Nursery v. E.I. DuPont*

---

[84]*Id* at 19:24-20:18.

[85]*Id.* at 20:11-14.

[86]*Id.* at 20:4-7; 20:15-18.

*de Nemours & Co.*, 341 F.3d 1292, 1308 (11th Cir. 2003). Spoliation of evidence that is crucial to a claim or defense constitutes prejudice. *Managed Care Solutions, Inc. v. Essent Healthcare, Inc.*, No. 09-60351-CIV, 2010 WL 3368654, at *8(S.D. Fla. Aug. 23, 2010). Spoliation also includes the intentional concealment of evidence. *Managed Care Solutions, Inc. v. Essent Healthcare, Inc.* , 736 F.Supp.2d 1317 (S.D. Fla. 2010). Defendant has claimed throughout the pendency of this case that its telephone system was not capable of automatically dialing telephone numbers. It is crucial to both Plaintiff's claim and 21st Mortgage's defense that the telephone system was preserved, or at least allowed to be observed, in a "live" state to see what capabilities the telephone system actually had. Yet, Defendant failed to provide Plaintiff <u>any</u> notice the telephone system was no longer operation until just recently[87]. Prior to that time, Defendant 21st Mortgage never informed Plaintiff the telephone system at issue was going to be taken out of operation and/or was no longer in operation.

   In the companion case of Amelia Hunt, the wife of Plaintiff here, there is no question that the lawsuit was filed well before the telephone systems were changed, yet Defendant has failed to ever provide any notice to Plaintiff. This is likely due to the fact Plaintiff has discovered Defendant has no TCPA policies in place and

_____

[87]*See* Doc. 19-2, pp. 2-3, Response No. 2.

Defendant was unconcerned whether it was calling consumers on their cellular telephones[88]. Defendant 21st Mortgage has destroyed evidence that is crucial to Plaintiff's claim. Not only did 21st Mortgage destroy crucial evidence, it attempted to conceal the evidence from Plaintiff. It is apparent from Jim Collins' testimony that 21st Mortgage was unconcerned about preserving evidence involved in both this case and its predecessor, companion case involving Plaintiff's wife[89].

c.     Plaintiff is permanently prejudiced

Plaintiff has been irrevocably and permanently prejudiced. Plaintiff's expert, Robert Biggerstaff states in his report that he was unable to view the system in live operation to see exactly how it was used by 21st Mortgage[90]. It was crucial to Plaintiff's claims in this matter that the telephone system at issue was kept in live operation until, at least, he had a chance to inspect the system while it was live. However, Defendant failed to put a ligation hold on the telephone system and replaced the system without notice of any kind to Plaintiff, although there was ongoing litigation involving the subject system at all times. Now, due to Defendant's intentional and wanton actions, Plaintiff will never be able to see the "live" operation

---

[88]*See* Doc. 12-3, p. 8, Response Nos. 21-22

[89]*See* Doc. 29-1, Deposition of Jim Collins, Network Administrator for 21st Mortgage Corporation, 20:4-7; 20:11-18.

[90]*See* Doc. 44-11, Expert Report of Robert Biggerstaff, p. 6, ¶13.; p. 7, ¶16.

of the subject telephone system.

This is particularly disturbing when coupled with the facts Plaintiff requested information from Defendant in his discovery requests and Defendant concealed crucial information from Plaintiff, namely the existence of the mainframe server that actually ran the telephone system.  The disclosure and production of the dummy telephone module was not a mere oversight.  It was an intentional and calculated move on the part of Defendant because it believed it could avoid and hide what it knew to be the real issue - the telephone system it removed from service during pending litigation involving the subject system.

> d.    Sanctions are warranted

Sanctions are warranted when a party fails to preserve evidence that is crucial to a claim or defense of another party.  *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 945 (11th Cir. 2005).  Sanctions for spoliation of evidence may include "(1) dismissal of the case [or default judgment against defendant]; (2) exclusion of expert testimony; or (3) a jury instruction on spoliation which raises a presumption against the spoliator." *Id.*  Further, federal law governs the imposition of spoliation sanctions. *Id.*  Spoliation also includes the intentional concealment of evidence.  *Managed Care Solutions, Inc. v. Essent Healthcare, Inc.*, 736 F.Supp.2d 1317 (S.D. Fla. 2010).

There can be no doubt Defendant failed to preserve crucial evidence in this

matter, specifically, the live operation of the telephone system at issue.  In addition,

and even more heinous, is the fact Defendant attempted to conceal crucial evidence

from Plaintiff by failing to disclose or provide any information about the Nortel

mainframe that was the "brains" of the entire telephone system.  Defendant's claim

the dummy units were the entire telephone system by only disclosing information

about the dummy units in discovery and by parading around the dummy telephone

unit both at the depositions of Defendant and by bringing the dummy units to the

hearings before this Honorable Court representing them as the entirety of the

telephone system is a deliberate and unjustifiable attempt to conceal the true, relevant

evidence in this case - the Nortel CS1000 mainframe server[91].

The destruction and attempted concealment of this evidence is due to result in

sanctions against Defendant.  Plaintiff is due to be granted summary judgment on the

issue whether Defendant's equipment had the capacity to autodial telephone numbers

of consumers such as Plaintiff is this matter.  In the alternative,  Plaintiff is due a jury

instruction on spoliation raising the presumption Defendant's equipment had the

capacity to autodial telephone numbers.  If the Court does not allow one of the two

aforementioned remedies, at least, Defendant should be estopped from asserting its

---

[91]See Doc. 29-1, Deposition of Jim Collins, Network Administrator for 21st Mortgage
Corporation,28:16-23; 31:2-11.

former telephone system was not an automatic telephone dialing system due to its destruction and concealment of crucial evidence.

It is the opinion of Plaintiff's expert, from what he was able to observe of 21st Mortgage's operations since the actual system in use at the relevant periods had been taken off line during the pending companion case of Plaintiff's wife and just three (3) days prior to Plaintiff's lawsuit being filed, that 21st Mortgage utilized equipment that had the *present capacity* to autodial when it made the subject calls to Charles Hunt[92]. This comports with the testimony of Jim Collins, Network Administrator for 21st Mortgage[93].   Although the record clearly shows Plaintiff has met his burden for a claim under the TCPA, in any event, the least that can be said is there is genuine issue of material fact as to Plaintiff's TCPA claims and his TCPA claims are due to be heard by a jury.

C.    21st Mortgage is Liable to Plaintiff for Invasion of Privacy

1.    Legal Standard

"Alabama has long recognized that a wrongful intrusion into one's private activities constitutes the tort of invasion of privacy.  It is generally accepted that invasion of privacy can be independently established by four limited and distinct

---

[92]*See* Doc. 44-11, Expert Report of Robert Biggerstaff, pp. 10-11, ¶27

[93]*See* Doc. 29-1, Deposition of Jim Collins, Network Administrator for 21st Mortgage Corporation, 28:8-29:21.

wrongs, including: '(1) intruding into the plaintiff's physical solitude or seclusion; (2) giving publicity to private information about the plaintiff that violates ordinary decency; (3) putting the plaintiff in a false, but not necessarily defamatory, position in the public eye; or (4) appropriating some element of the plaintiff's personality for a commercial use.'" *Ex parte Birmingham News, Inc.*, 778 So.2d 814, 818 (Ala. 2000) *(quoting Johnston v. Fuller*, 706 So.2d 700, 701 (Ala. 1997)).

The Alabama Supreme Court has stated a person's privacy is invaded when a person's physical solitude or seclusion is intruded upon by another. *See Carter v. Innisfree Hotel, Inc.*, 661 So.2d 1174 (Ala. 1995). "One may invade another's privacy through either an intrusion upon a physical space, such as a trespass, or *by an invasion of one's 'emotional sanctum'*; the law prohibits a wrongful intrusion into either of these areas of privacy. *Phillips v. Smalley Maint. Servs., Inc.*, 435 So.2d 705, 708 (Ala. 1983) (emphasis added).   Further, the Alabama Supreme Court adopted the Restatement (Second) of Torts § 652B (1977) in *Phillips*. *Id.* at 708-11.  Comment d. to the  Restatement (Second) of Torts § 652B (1977) specifically talks about debt collection with respect to the invasion of a person's privacy.  Comment d. states a person's privacy is invaded "*when the telephone calls are repeated with such persistence and frequency as to amount to a course of hounding the plaintiff*." Restatement (Second) of Torts § 652B, cmt. d. (1977) (emphasis added).

2.    Plaintiff's Claims

Charles Hunt is basing his claims of invasion of privacy upon violation of state law contrary to 21st Mortgage's assertion in its Motion for Summary Judgment that he is basing his claims for invasion of privacy upon its violations of the TCPA and/or other state law.  While some of the facts for his claims of Defendant's invasion of his privacy are the same for most of his claims, including his TCPA claims, his claims that 21st Mortgage violated state law are wholly dependent on the elements of a claim for invasion of privacy and are independent of any other state or federal claim.

3.    Cases Relied Upon by Defendant

The cases cited by 21st Mortgage in its motion are easily distinguishable from the instant lawsuit.  The main case relied upon by 21st Mortgage, *Sparks v. Phillips & Cohen Associates, Ltd.*, 641 F. Supp. 2d 1234 (S.D. Ala. 2008), is inapposite to the case at bar.  *Sparks* involved collecting debts of an estate.   The debt collector *made one call* to the person who was handling the affairs of the deceased debtor; *one call* to the lawyer for the person who was handling the affairs of the deceased; and *one call* that was answered by the lawyer's daughter.  641 F. Supp. 2d at 1253. Most importantly, there were *no calls to anyone's cellular telephone* in *Sparks*.  There were no repeated attempts by a third-party to stop calling their cellular telephone.  To the contrary, after each third-party asked *once* to stop contacting them on *landline*, the

debt collector did so.  The facts in *Sparks* are altogether inapposite to the case at bar.

In *Windsor* v. *General Motors Acceptance Corp.,* 323 So.2d 350  (1975), the creditor contacted *the debtor* by telephone *at her residence* 3 to 4 times, came to her mother's home *where the debtor lived* about 15-20 times over a one to two-year period of time about *the debtor's* delinquent payments, and spoke to *the debtor's* mother (with whom the debtor lived) at her residence several times.  *Windsor* v. *General Motors Acceptance Corp.,* 323 So.2d at 351-52.  First, the amount of telephone calls in *Windsor* are not in the same realm as the case at bar.  Second, there were no cellular telephones when *Windsor* was decided so calling the plaintiff in *Windsor* on her cellular telephone would have been impossible.  Third, there is no evidence in *Windsor* that the collector was attempting to collect from the debtor's mother only that it spoke to her a few times about the debtor.  The facts in *Windsor* pale in comparison to the facts in the instant case.

*Baldwin* v. *Blue Cross/Blue Shield of Alabama,* 480 F.3d 1287 (11th Cir.2007) is a Title VII sexual harassment action alleging harassment by a supervisor and alleging retaliation. The plaintiff claimed she was sexually harassed by her supervisor. *Baldwin* v. *Blue Cross/Blue Shield of Alabama,* 480 F.3d at 1292. The plaintiff complained about her supervisor well after the incidents occurred, but Blue Cross still offered to bring in an industrial psychologist to help her sort out her problems with her

manager, which she refused. *Id*. at 1299. Blue Cross then offered her a transfer to a different office, which she refused. *Id*.

Since she was unwilling to work for her supervisor and unwilling to transfer, she was terminated. *Id*. Other than reciting the combined elements for an invasion of privacy claim and an outrage claim, it is unclear what *Baldwin* has to do with an invasion of privacy claim in a debt collection context. It is clear from reading the opinion the Court did not find the plaintiff in *Baldwin* credible. The facts in the instant case are so far out of context with the facts in *Baldwin* it is impossible to analogize the two cases. The facts in *Baldwin* in no way concerned calling a non-party debtor numerous times on his cellular telephone to collect a debt he did not owe.

As far as mental suffering is concerned, Charles Hunt testified to how telephone calls to Mr. Hunt's family, ex-wife and neighbors about a debt he did not owe caused him embarrassment and humiliation[94]. 21st Mortgage called his ex-wife, with whom he had not spoken to in years, about a debt he did not owe[95]. 21st Mortgage called Mr. Hunt's mother in Atlanta and greatly upset her[96]. Even the corporate witness for 21st Mortgage agreed that calling Mr. Hunt's relatives, such as his ex-wife, could be

---

[94]*See* Doc. 44-4 (Hunt Depo. Tr.) at 70:3-6.

[95]*See* Doc. 44-5 (Hunt Depo. Tr.) at 167:22-168:8.

[96]*See* Doc. 44-4 (Hunt Depo. Tr.) at 71:23-74:22.

construed as harassment[97].   Moreover, Mr. Hunt testified that the stress of 21st Mortgage constantly calling his cellular telephone about a debt he did not owe not only caused him health issues, like not sleeping, headaches and upset stomach, it almost caused him to divorce his wife, who owed the debt[98].

The last case cited by Defendant with regard to Mr. Hunt's invasion of privacy claims is *Deutsche Bank Trust Co. Americas v. Garst*, 2:11-CV-04027-WMA, 2013 WL 4851493 (N.D. Ala. Sept. 11,2013), a case decided by this Honorable Court.  The Court having more knowledge than Plaintiff, he will not regurgitate the facts of this case back to the Court.  *Garst* concerned post-foreclosure ejectment activities. This Honorable Court stated, "Garst appears to confuse the issue of whether there was an outrageous intrusion with whether there was a valid foreclosure." *Deutsche Bank Trust Co. Americas v. Garst*, 2:11-CV-04027-WMA, 2013 WL 4851493 at *10.

The facts of *Garst*, although cast in a quasi debt collection context since foreclosure and an action for ejectment are not necessarily debt collection, are distinguishable from the facts of the case at bar.  However, this Court did note that "hounding" a plaintiff with "repeated conduct equating deliberate harassment" can be an invasion of privacy, although this analysis was limited to the mortgage servicing

---

[97]*See* Doc. 44-2 (Caldwell Depo. Tr.) at 247:13-248:2.

[98]*See* Doc. 44-5 (Hunt Depo. Tr.) at 149:15-150:5.

context in the *Garst* opinion. *Id.* If *Garst* has any effect on the instant case, it supports Charles Hunt's claims that 21st Mortgage invaded his privacy intruding upon his seclusion by hounding him on his cellular telephone and contacting his relatives about a debt he did not owe.

4.    The Facts in This Case are Egregious

The facts surrounding Charles Hunt's claims in this matter are as egregious, if not more so, than the facts in cases where the plaintiffs' invasion of privacy claims precluded summary judgment, were upheld on appeal, or supported a damages claim. *See Winberry v. United Collection Bureau, Inc*., 697 F.Supp.2d 1279 (M.D.Ala. 2010); *Jacksonville State Bank v. Barnwell*, 481 So.2d 863 (Ala. 1985); and *Black v. Aegis Consumer Funding Group, Inc.,* 2001 WL 228062 (S.D.Ala. 2001).    In *Winberry*, the plaintiffs claimed thirty-three (33) phone calls to their *residence* to collect a debt as well calls made to a non-debtor spouse *at their residence*. *Winberry v. United Collection Bureau, Inc*., 697 F.Supp.2d at 1294-95.  In this case, the facts show Charles Hunt, the non-debtor spouse, received numerous calls to his *cellular telephone*, in addition to the calls to his residence and in addition to the calls to his relatives and neighbors.  The facts presented here are more egregious than the facts in *Winberry* where the Court allowed the invasion of privacy claim to go forward.

The *Barnwell* case involved calls to the *debtor's residence* and place of

employment and the *debtor's* mother in addition to using coarse language towards the *debtor*.  *Jacksonville State Bank v. Barnwell*, 481 So.2d at 865-66.  In *Aegis*, the defendant made approximately twenty phone calls within a period of about one month to the plaintiff's *home* and work, in addition to calling the plaintiff's parents.  *Black v. Aegis Consumer Funding Group, Inc.,* 2001 WL 228062 at *6.

       a.       Defendant hounded Plaintiff on His Cellular Telephone

In the case *sub judice*, 21st Mortgage engaged in a systematic campaign of harassment bombarding Mr. Hunt's cellular telephone at home, work, or wherever he was and at anytime it wanted[99].  The corporate witness for 21st Mortgage  and one of its supervisors, Walden Buttram, both testified that the number listed as "#7" in 21st Mortgage's call logs was the cellular telephone  of Charles Hunt "captured" by 21st Mortgage when he called[100]. The call notes produced by 21st Mortgage show it called Charles Hunt's cellular telephone number *approximately 150 times* between August, 2008 and August, 2011[101].  In a span of one month from June 8, 2011 through July 8, 2011,  21st Mortgage called Mr. Hunt's cellular telephone number twenty-five (25)

---

[99]Pl. Ex. D., Call Notes Produced by 21st Mortgage, pp. C. Hunt 35 - C. Hunt 87, each "#7."

[100]*See* Doc 44-2 (C. Caldwell Depo Tr.) at 133:6-134:15; Pl. Ex. A (Buttram Depo Tr.) at 61:22-65:2.

[101]*See* Pl. Ex. D., Call Notes Produced by 21st Mortgage, pp. C. Hunt 35 - C. Hunt 87, each "#7".

times[102].

When Charles Hunt called 21st Mortgage on March 12, 2007, 21st Mortgage "captured" his number and then began calling it routinely[103].  21st Mortgage was unconcerned with whether the number it was calling was a cellular telephone[104].  Yet, 21st Mortgage refused to stop calling his cellular telephone even after Mr. Hunt instructed it to stop calling it on numerous occasions[105].

21st Mortgage's call notes reflect Charles Hunt told them he was "not on the loan" and not to call his cellular telephone[106].  However, 21st Mortgage was only emboldened by this to continue to harass Mr. Hunt on his cellular telephone. 21st Mortgage made numerous calls to Mr. Hunt's cellular telephone about a debt he did not owe[107].  21st Mortgage called Mr. Hunt on his cellular telephone multiple times on

---

[102]*See* Pl. Ex. D., Call Notes Produced by 21st Mortgage, pp. C. Hunt 44 - C. Hunt 45, each "#7".

[103]*See* Pl. Ex. D., Call Notes Produced by 21st Mortgage, p. C. Hunt 86 at 2008/04/08-16:04; 2008/04/07 at 12:04.

[104]*See* Doc. 12-3, p. 8, Nos. 21-22.

[105]See Docs. 44-3; 44-4 (Hunt Depo. Tr.) at 53:20-54:22; 96:12-21; 106:4-11.

[106]*See* Pl. Ex. D., Call Notes Produced by 21st Mortgage, p. C. Hunt 81 at 2008/11/26-11:11

[107]*See* Doc. 44-2 (Caldwell Depo. Tr.) at 137:21-23; Doc. 47-1, Revised Affidavit of Charles Hunt; 47-2, Exhibit A, Summary of Calls from 21st Mortgage; Pl. Ex. D., Call Notes Produced by 21st Mortgage, pp. C. Hunt 35 - C. Hunt 87, each #7.

the same day[108].  21st Mortgage also called Mr. Hunt at work and on weekends[109].

Like the vast majority of people in today's society, Charles Hunt keeps his cellular telephone on his person or at his side at all times.  The systematic campaign of harassment of 21st Mortgage calling his cellular telephone about a debt he did not owe and had repeatedly instructed not to call, is an invasion of Charles Hunt's "emotional sanctum" and his physical solitude and seclusion.  The facts in this case are egregious.  Debt collectors cannot be allowed to hound non-debtors on their cellular telephones about other people's debts, especially after the non-debtor directs the debt collector to stop calling them on a cellular telephone.

> b.    Defendant Ridiculed Plaintiff when Calling Him on His Cellular Telephone

Not only was 21st Mortgage hounding him by calling his cellular telephone when Mr. Hunt talked to them on his cellular telephone they would be rude, play games with him, and even make very condescending and infuriating remarks like telling him to "grow up and act like an adult[110]."  21st Mortgage went beyond all bounds of human decency when, even knowing Mr. Hunt was not liable for the debt, one of the collectors inquired into his personal financial status for payment of the debt

---

[108]See Docs. 44-3; 44-4  (Hunt Depo. Tr.) at 53:20-54:22; 107:17-109:9.

[109]Id.

[110]See Docs. 44-3; 44-4 (Hunt Depo. Tr.) at 42:4-21; 78:19-79:12.

he did not owe[111].

      c.    21st Mortgage Skip Traced for Charlie Hunt's Relatives and Neighbors

The facts in this case become even more egregious given the fact 21st Mortgage began skip tracing Charles Hunt's, a *third party*, *non-debtor*, relatives and neighbors to collect a debt.  Although Charlie Hunt was not liable to 21st Mortgage in anyway, 21st Mortgage skip traced Charles Hunt's information in Accurint[112].  21st Mortgage also called Mr. Hunt's elderly mother, his sister in Mobile, his ex-wife, and his daughter[113].  The telephone calls to Mr. Hunt's family, ex-wife and neighbors about a debt he did not owe caused him embarrassment and humiliation[114].  21st Mortgage called Charles Hunt's ex-wife, Joy, with whom he had not spoken to in years about a debt he did not owe[115].  Kevin, a collector with 21st Mortgage, called Mr. Hunt's mother in Atlanta and greatly upset her[116]. Even the corporate representative of 21st Mortgage agreed that calling Mr. Hunt's relatives, such as his ex-wife, could be

---

[111]*See* Doc. 44-5 (Hunt Depo. Tr.) at 168:18-169:5.

[112]*See* Pl. Ex. D., Call Notes Produced by 21st Mortgage, p. 74 at 2009/06/16-15:06; p. 40; p. 41; p. 62.

[113]*See* Doc. 44-4 (Hunt Depo. Tr.) at 69:1-71:11; Doc. 44-9, Affidavit of Lauren Randall; Doc. 44-10, Affidavit of Mary Honkanen.

[114]*See* Doc. 44-4 (Hunt Depo. Tr.) at 70:3-6.

[115]*See* Doc. 44-5 (Hunt Depo. Tr.) at 167:22-168:8.

[116]*See* Doc. 44-4 (Hunt Depo. Tr.) at 71:23-74:22.

construed as harassment[117].   Mr. Hunt testified that the stress of 21st Mortgage constantly calling his cellular telephone about a debt he did not owe not only caused him health issues, like not sleeping, headaches and upset stomach, it almost caused him and Amelia Hunt to divorce[118].

The facts showing the harassment, embarrassment, and humiliation of Mr. Hunt by 21st Mortgage's actions in this case are undisputed and clear.   21st Mortgage willfully, wantonly, and intentionally invaded Charles Hunt's "emotional sanctum" by engaging in a systematic campaign of harassment calling his cellular telephone with such persistence and frequency that it amounted to hounding him in an obvious and clear violation of Alabama law.   Charles Hunt should be granted summary judgment in his favor with respect to his claim that 21st Mortgage invaded his privacy. However, at the very least, there is a jury question as to whether 21st Mortgage invaded Mr. Hunt's privacy and this claim is due to be heard by a jury.

D.      21st Mortgage is Liable to Plaintiff for Its Negligence or Wantonness

The elements for recovery under a negligence theory are: (1) duty, (2) breach of duty, (3) proximate cause, and (4) injury. *Yamaha Motor Co. v. Thornton*, 579 So.2d 619, 623 (Ala.1991).   "To establish wantonness, a plaintiff must prove that the

---

[117]*See* Doc. 44-2 (Caldwell Depo. Tr.) at 247:13-248:2.

[118]*See* Doc. 44-5 (Hunt Depo. Tr.) at 149:15-150:5.

defendant, with reckless indifference to the consequences, consciously and intentionally did some wrongful act or omitted some known duty. To be actionable, that act or omission must proximately cause the injury of which the plaintiff complains." *Brushwitz v. Ezell*, 757 So.2d 423, 432-33 (Ala.2000)(*quoting Martin v. Arnold*, 643 So.2d 564, 567 (Ala.1994)).  A creditor owes a debtor and customer a duty of reasonable care in the handling of his account, which includes the collection of his debt. *See  Colorado Capital v. Owens,* 227 F.R.D. 181, 188 (E. D.N.Y.2005) To show proximate causation, "a plaintiff must establish that the defendant's negligence was a substantial foreseeable factor in bringing about his or her injury." *Johnson v. Brvco Arms*, 304 F.Supp.2d 383, 395 (E.D.N.Y.2004). The issue of proximate causation is generally a question of fact. *See Colorado Capital*, 227 F.R.D. at 189.

21st Mortgage had a duty under state and federal law not to harass, embarrass, and humiliate *Amelia* Hunt with respect to attempting to collect upon a debt which *she did owe*.  How then can it be said 21st Mortgage did not have, at least, a societal duty not to harass, embarrass, and humiliate *Charles* Hunt with respect to attempting to collect upon a debt which *he did not owe*?   *A fortiori*, after being told repeatedly to stop contacting him, his relatives, and neighbors about the debt he did not owe.   This duty is even more apparent when 21st Mortgage knew or should have known Charles

Hunt was in no way responsible for the debt it was collecting[119].  If there was no duty to a third party, non-debtor like Charles Hunt, as 21st Mortgage claims, then why does 21st Mortgage have policies and procedures in place with respect to calling third parties, especially a policy titled, "Potential Liabilities?[120]" Indeed, the damages he suffered were not only foreseeable, they were imminent.

After being told not to call his cellular telephone, 21st Mortgage continued to contact him about the debt and demanded payments from him even asking him about his personal finances[121].   Mr. Hunt told the collectors from 21st Mortgage it was not his debt and not to call him on his cellular telephone, yet 21st Mortgage ignored his requests and continuously called him on his cellular telephone[122].  21st Mortgage's collectors continued hounding Charles Hunt after his verbal instruction not to call him violating 21st Mortgage's own policies[123].  Morever, 21st Mortgage even continued to

---

[119]*See* Doc. 44-1, Contract; Doc. 44-2, (Caldwell Depo Tr.) at 137:21-138:2; Pl. Ex. D, Call Notes, p. C Hunt 81 at 2008/11/26-11:11.

[120]*See* Pl. Ex. E, Potential Liabilities, #6 - Stop Calling.

[121]*See* Pl. Exhibit C (Hunt Depo. Tr.) at 168:18-169:5.

[122]*See* Pl. Exhibit C (Hunt Depo. Tr.) at 53:20-54:22; Pl. Ex. D, Call Notes, p. C Hunt 81 at 2008/11/26-11:11.

[123]*See* Pl. Ex E, Potential Liabilities, #6 - Stop Calling; Doc 44-15, 21st Mortgage Corporation's Prohibited Collection Practices.

call after his written demand to stop calling his cellular telephone[124].  This conduct is, at the very least, negligent.

Defendant 21st Mortgage made numerous calls to Mr. Hunt's cellular telephone in a systematic campaign of harassment about a debt he did not owe even after he re repeatedly asked them not to call his cellular telephone[125].  21st Mortgage often called Mr. Hunt multiple times on the same day[126].  The continual harassment of a non-debtor, third party as a means of policy amounts to an intentional act.  Even more so, there can be no doubt this conduct shows reckless indifference.

Charles Hunt was called on his cellular telephone at work and on weekends about a debt he did not owe and after he repeatedly instructed 21st Mortgage not to call him on his cellular telephone[127].  Defendant 21st Mortgage was not only hounding him by calling his cellular telephone continuously, but whenever Mr. Hunt did talk to them on his cellular telephone, the debt collectors of 21st Mortgage would be rude, play "bad guy, good guy" games with him, and even make very snide and infuriating

---

[124]*See* Doc. 44-5 (Hunt Depo Tr.) at 119:9-120:22; Doc. 44-5 (Hunt Depo Tr.) at 121:7-13; Doc 44-2 (C. Caldwell Depo Tr.) at 230:20-234:2; Pl. Ex. D., Call Notes Produced by 21st Mortgage, pp. C. Hunt 35 - C. Hunt 87; Doc. 44-16, Do Not Call Policy; Doc. 44-15, Prohibited Collection Practices; Pl. Ex. E, Potential Liabilities.

[125]*See* Pl. Exhibit D, Affidavit of Charles Hunt, Exhibit A, Summary of Calls from 21st Mortgage.

[126]*See* Pl. Exhibit C (Hunt Depo. Tr.) at 53:20-54:22; 107:17-109:9.

[127]*Id.*

remarks like "grow up and act like an adult[128]."  The injuries suffered by Charles Hunt

were foreseeable and a proximate and natural consequence of 21st Mortgage's conduct

in this case.

The actions of 21st Mortgage directly and proximately caused Charles Hunt to

suffer embarrassment and humiliation[129].   21st Mortgage called his ex-wife, Joy, with

whom he had not spoken to in years about the debt he did not owe[130].  One collector

called Mr. Hunt's mother in Atlanta and made her so mad she could not discuss it with

Mr. Hunt[131]. The  corporate  representative  of  21st  Mortgage  even  agreed  it  was

harassing to call Mr. Hunt's relatives like his ex-wife[132].  Mr. Hunt testified that the

stress of 21st Mortgage constantly calling his cellular telephone about a debt he did not

owe not only caused him health issues, such as inability to sleep, headaches and an

upset stomach, it almost caused him to divorce his wife[133].

21st Mortgage skip traces for numbers of relatives of debtors through the use of

---

[128]See Pl. Exhibit C (Hunt Depo. Tr.) at 42:4-21; 78:19-79:12.

[129]See Pl. Exhibit C (Hunt Depo. Tr.) at 70:3-6.

[130]See Pl. Exhibit C (Hunt Depo. Tr.) at 167:22-168:8.

[131]See Pl. Exhibit C (Hunt Depo. Tr.) at 71:23-74:22.

[132]See Doc. 44-2 (Caldwell Depo. Tr.) at 247:13-248:2.

[133]See Pl. Exhibit C (Hunt Depo. Tr.) at 149:15-150:5.

Accurint and then starts calling them[134].  However, in this case, 21st Mortgage skip traced Charles Hunt, a non-debtor, third party, to call *his* relatives about a debt for which he is not liable.  It also "captures" the telephone numbers of anyone who calls in about an account regardless of whether that person is liable for the account and then starts calling that third party anytime a payment is not made or is late just as happened with Charles Hunt here[135].   The most egregious fact here may be that 21st Mortgage makes <u>no</u> effort to distinguish whether the numbers it captures from persons calling it or skip traced through Accurint are land lines or cellular telephone numbers[136]. Thus, 21st Mortgage acted with reckless indifference and was completely unconcerned whether the number it was calling was a third party's cellular telephone number. In addition, the collectors were unconcerned they were harassing a third party, non-debtor about a debt he did not owe by continually calling his cell phone[137].   The facts clearly show the conduct of 21st Mortgage towards Mr. Hunt was willful and wanton.

Based on the foregoing, summary judgment should be entered in *Plaintiff's* favor, however, in response to 21st Mortgage's Motion for Summary Judgment, there is, at least, a genuine issue of material fact whether 21st Mortgage's actions were

---

[134]*See* Doc. 44-2 (Caldwell Depo. Tr.) at 202:17-25.

[135]*Id.*

[136]*See* Doc. 12-3, p.8, Nos. 21-22; Doc. 44-2 (Caldwell Depo. Tr.) at 202:17-25.

[137]*See* Pl. Ex. D, Call Notes Produced by 21st Mortgage, pp. C Hunt 35 - C. Hunt 87.

wanton and/or negligent and Mr. Hunt's claims on these issues are due to proceed to a jury.

E.     21st Mortgage is Liable to Plaintiff for the Actions of Its Employees

To prove a claim of negligent supervision, a plaintiff must show that the employer knew, or in the exercise of ordinary care should have known, that its employee was incompetent. *Armstrong Bus. Servs., Inc. v. AmSouth Bank*, 817 So.2d 665, 682 (Ala.2001). "[A] party alleging negligent supervision and hiring must prove the underlying wrongful conduct of the defendant's agents." *Samuels v. Midland Funding, LLC*, 921 F.Supp.2d 1321, 1337-38 (S.D.Ala.2013) *quoting Flying J Fish Farm v. Peoples Bank*, 12 So.3d 1185, 1196 (Ala.2008) (internal quotes omitted).

However, in the instant case, the hiring, supervision and training of the employees of 21st mortgage were more than negligence, they rise to level of wantonness.  "'Wantonness" is defined in § 6–11–20(b)(3) as '[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others.'" *Big B, Inc. v. Cottingham,* 634 So.2d 999, 1004 (Ala.1993).   "'What constitutes wanton misconduct depends on the facts presented in each particular case.'" *Id. quoting South Central Bell Telephone Co. v. Branum*, 568 So.2d 795 (Ala.1990).  "'Implicit in wanton, willful, or reckless misconduct is an acting, with knowledge of danger, or with consciousness, that the doing or not doing of some act will likely result in

injury....'" *Id. quoting Lynn Strickland Sales & Service, Inc. v. Aero–Lane Fabricators, Inc*., 510 So.2d 142,145 (Ala.1987).

Defendant 21st Mortgage operated with full knowledge of its collectors' actions in this matter[138]. Its own policies dictated some of the wrongs incurred by Charles Hunt would occur[139]. 21st Mortgage expected its collectors to hound Charles Hunt, a non-debtor, third party by engaging in a systematic campaign of harassment through calling his cellular telephone over, even after he told them to stop[140]. 21st Mortgage knew of and expected its collectors to skip trace for non-debtor, third party Charles Hunt's relatives and then to call them as well[141]. The damages suffered by Charles Hunt were not only foreseeable to 21st Mortgage, they were imminent. The conduct of 21st Mortgage was, unassailably, intentional.

The environment fostered by 21st Mortgage encouraged and required the actions its collectors took with regard to attempting to collect a debt from Charles Hunt he did not owe and for which he was not liable. This includes the condescending nature of

---

[138]*See* Pl. Ex. D, Call Notes Produced by 21st Mortgage, pp. C Hunt 35 - C. Hunt 87.

[139]*See* Doc. 44-17, 21st Mortgage Corporation's Skip Tracing Policy; Pl. Ex. D., Call Notes Produced by 21st Mortgage, p. 74 at 2009/06/16-15:06; p. 40; p. 41; p. 62.

[140]*See* Pl. Ex. D, Call Notes Produced by 21st Mortgage, pp. C Hunt 35 - C. Hunt 87.

[141]*See* Pl. Ex. D., Call Notes Produced by 21st Mortgage, p. 74 at 2009/06/16-15:06; p. 40; p. 41; p. 62; Doc. 44-4 (Hunt Depo. Tr.) at 69:1-71:11; Doc. 44-9, Affidavit of Lauren Randall; Doc. 44-10, Affidavit of Mary Honkanen.

the conversations some of the collectors took with Mr. Hunt, including invading the privacy of his personal finances[142].  Indeed, 21st Mortgage does not discipline its collectors for harassing debtors and third parties about debts it collects, rather it disciplines collectors for not harassing them enough[143].

21st Mortgage demands its collectors skip trace and call relatives of accounts that are a few days behind on payment[144].  If the collectors are not harassing debtors and their relatives enough, the collectors are given disciplinary notices[145].  Plaintiff requested through discovery all the disciplinary records of the persons who collected upon the Amelia Hunt account for which Charles Hunt was being contacted[146].  21st Mortgage states it employs  about two hundred twenty-five debt collectors (225) at a given time[147].  According to 21st Mortgage, there were twenty-five (25) different collectors who collected upon the Amelia Hunt account from January, 2005 through

---

[142]*See* Doc. 44-5 (Hunt Depo. Tr.) at 168:18-169:5; Doc. 44-4 (Hunt Depo. Tr.) at 78:19-79:12; Doc. 44-3 (Hunt Depo. Tr.) at 42:4-21.

[143]*See* Doc. 44-13, Disciplinary Records of Collectors on the Amelia Hunt Account.

[144]*See* Doc. 44-17, 21st Mortgage Corporation's Skip Tracing Policy; Doc. 44-13, Disciplinary Records of Collectors on the Amelia Hunt Account.

[145]*See* Doc. 44-13, Disciplinary Records of Collectors on the Amelia Hunt Account.

[146]*See* Doc. 44-12, Plaintiff's 2nd Request for Production of Documents to 21st Mortgage, No. 16.

[147]*See* Doc. 44-2 (Caldwell Depo. Tr.) at 31:3-6.

January, 2012[148].  Each of these collectors have about five hundred (500) loans they are responsible for collecting[149].

However, throughout the seven years of collecting, 21st Mortgage records show that the only discipline any of these collectors ever received in that seven (7) year period was for things other than the harassment of its customers, or especially, third parties like relatives, friends, and neighbors of customers such as Charles Hunt[150]. How can it be that *no* collector was disciplined in seven (7) years for being overly aggressive?  21st Mortgage's records prove too much.  Not only were the actions of its collectors here sanctioned by Defendant, they were expected by it.

Indeed, overly aggressive collecting is of no concern to 21st Mortgage and is not something that is discouraged.  To the contrary, 21st Mortgage's policies and environment *encourage* the type of behavior that occurred in this case[151].  Instead, collectors of 21st Mortgage are disciplined for being late[152], wearing too short of a

---

[148]*See* Doc. 44-14, 21st Mortgage's Responses to Plaintiff's 2nd Request for Production, No. 16.

[149]*See* Doc. 44-2 (Caldwell Depo. Tr.) at 31:7-21.

[150]*See* Doc. 44-13, Disciplinary Records of Collectors on the Amelia Hunt Account.

[151]*See* Doc. 44-17, 21st Mortgage Corporation's Skip Tracing Policy; Doc. 44-13, Disciplinary Records of Collectors on the Amelia Hunt Account.

[152]*See* Doc. 44-13, Disciplinary Records of Collectors on the Amelia Hunt Account, p. C Hunt 223.

dress[153], and for missing their performance metrics, like *failing to harass* customers on a daily basis[154]. Their collectors get in trouble for *not* skip tracing for customer's relatives[155].

However, 21st Mortgage's collectors clearly violated company policy by calling Charles Hunt after his *verbal* instruction not to call him[156]. Yet, no collector was ever disciplined for blatantly violating *this* company policy[157]. It is obviously not a policy that 21st Mortgage enforces. These policies are mere window dressing to serve in discovery when a customer has enough of their harassment and files a lawsuit like the case at bar.

21st Mortgage admitted it violated its own policies when collectors continued to call Charles Hunt after it received *written notice* to stop calling on August 12, 2011[158]. Again, no collector was ever disciplined for *these* violations. The corporate

---

[153]*See* Doc. 44-13, Disciplinary Records of Collectors on the Amelia Hunt Account, p. C Hunt 251.

[154]*See* Doc. 44-13, Disciplinary Records of Collectors on the Amelia Hunt Account, p. C Hunt 226 Nos. 1-2; C Hunt 228; C Hunt 234; C Hunt 238;C Hunt 240: C Hunt 242: C Hunt 252-54; C Hunt 256

[155]*Id.*

[156]*See* Doc. 44-15, 21st Mortgage Corporation's Prohibited Collection Practices.

[157]*See* Doc. 44-13, Disciplinary Records of Collectors on the Amelia Hunt Account.

[158]*See* Doc. 44-2 (Caldwell Depo. Tr.) at 231:19-234:2; Doc. 44-16, 21st Mortgage Corporation's Do Not Call Policy.

representative of 21st Mortgage admitted calling Mr. Hunt's relatives like his ex-wife could be harassing to him[159].   However, no collector was disciplined for these activities, either.

In addition, 21st Mortgage provides its employees <u>no</u> training to ensure compliance with the Telephone Consumer Protection Act ("TCPA")[160]; it has no procedures in place to ensure compliance with the TCPA[161]; and makes no effort to distinguish whether the numbers it captures from persons calling it or skip traces through Accurint are land lines or cellular telephone numbers[162].

It cannot be more clear that 21st Mortgage not only fostered and encouraged the conduct its employees engaged in against Charles Hunt, it expected and required this type of conduct in an environment that caused Mr. Hunt to be continually harassed for more than five years over a debt he did not owe and for which he was not liable. There is no genuine issue of material fact as to whether 21st Mortgage was negligent in the hiring, training, and supervision of its employees, and *Mr. Hunt* should be granted summary judgment on these claims. Based on the evidence, there is no genuine issue of material fact 21st Mortgage was wanton in its training and supervision

---

[159]*See* Doc. 44-2 (Caldwell Depo. Tr.) at 247:13-248:2.

[160]*See* Doc. 44-2 (Caldwell Depo. Tr.) at 160:14-23.

[161]*See* Doc. 44-2 (Caldwell Depo. Tr.) at 182:11-13.

[162]*See* Doc. 12-3, p.8, Nos. 21-22; Doc. 44-2 (Caldwell Depo. Tr.) at 202:17-25.

of its collectors.  Thus, in response to 21st Mortgage's Motion for Summary Judgment, if Plaintiff is not due summary judgment on these claims, neither is Defendant as there will be a genuine issue of material fact for the trier of fact.  As a result, Defendant's motion is due to be denied as to these claims and such claims are due to be heard by a jury.

      F.    <u>Fair Debt Collection Practices Act Claims</u>

The records produced by 21st Mortgage do not indicate the loan was in default when it was acquired from the original creditor.  Plaintiff does not have any evidence contrary to the records of Defendant.  Accordingly, Plaintiff concedes that his claims for violations of the FDCPA cannot go forward.

WHEREFORE, PREMISES CONSIDERED, Plaintiff moves this Honorable Court to **<u>deny</u>** Defendant 21st Mortgage Company's Motion for Summary Judgment on Counts I, II, III, and IV of his Complaint and to allow said claims to proceed to a trial by jury.

Respectfully submitted this   <u>2nd</u>   day  <u>January</u>   , 2014.

                           <u>   s/Wesley L. Phillips          </u>
                           Attorney for Plaintiff
                           Wesley L. Phillips

<u>OF COUNSEL</u>:
PHILLIPS LAW GROUP, LLC
Post Office Box 362001
Birmingham, Alabama 35236

Telephone: (205) 383-3585
Facsimile: (800) 536-0385
Email: wlp@phillipslaw.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the above and foregoing document has been served on all parties/attorney(s) of record via either U.S. Mail, postage prepaid, electronic mail, facsimile, and/or electronic mail through the ECM/CF system this __2nd__ day of __January__, 2014.

David Wilson
James E. Mitchell, Jr.
WILSON & BERRYHILL
One Metroplex Drive, Suite 250
Montgomery, Alabama 35209

                                    _s/Wesley L. Phillips_____
                                    OF COUNSEL