FILED
2014 Feb-04  PM 03:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CHARLES HUNT, | } | |
| | } | |
| Plaintiff, | } | |
| | } | CIVIL ACTION NO. |
| v. | } | 2:12-CV-2697-WMA |
| | } | |
| 21st MORTGAGE CORPORATION, | } | |
| a Corporation, | } | |
| | } | |
| Defendant. | } | |

### MEMORANDUM OPINION AND ORDER

Charles Hunt ("Mr. Hunt" or "plaintiff") brings this action against 21st Mortgage Company ("21st Mortgage" or "defendant") seeking damages for unwanted debt collection phone calls made by defendant.  Plaintiff brings a federal claim under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, upon which he invokes this court's jurisdiction, and four related state law claims over which the court has supplemental jurisdiction.[1] Before the court are the parties' cross motions for summary judgment, along with defendant's supporting motion to strike certain evidence.  For the reasons that follow, defendant's motion to strike will be granted in part and denied in part.  Based on the evidence that remains, defendant's summary judgment motion will be denied as to the TCPA and invasion of privacy claims, but granted

---

[1]Plaintiff has conceded that his claim under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq*, should be dismissed.  *See* Pl.'s Opp'n at 55.

1

as to the other state law claims.  Plaintiff's motion will be denied.

**Background**

The debt that brought these two parties into conflict involved, at the outset, neither of them.  In 2000, third party Bradley Faile purchased a manufactured home from third party Chase Manhattan Bank pursuant to an installment contract.  Def.'s Facts ¶ 2.  Amelia Hardiman, Faile's mother and plaintiff's later-to-be wife, co-signed the contract as guarantor.  *Id.*  It was not until nearly five years later that the two parties to this case became involved.  In December, 2004, defendant acquired Chase Manhattan's interest in the installment contract.  *Id.* ¶ 4.  Nine months later, in September, 2005, plaintiff made the first of several payments on the contract on behalf of Hardiman, his then girlfriend.  *Id.* ¶ 5.

The next three years were years of apparent harmony.  In November, 2007, plaintiff and his girlfriend were married, and Amelia Hardiman became Amelia Hunt.  *Id.* ¶ 1.  Meanwhile, Ms. Hardiman/Hunt made regular payments to defendant, *see* Payment History, Def.'s Ex. B3, at 6-10, only a few of which were made by plaintiff on behalf of his wife, *see* Caldwell Aff., Def.'s Ex. B, ¶ 6.

In 2008, however, the Hunts' relationship with defendant soured.  Mr. Hunt testifies that he suffered a downturn in his business, and fell behind on payments on "almost everything."  Hunt

Dep. at 151.  Ms. Hunt's finances were apparently in no better shape.  The payments on the Faile contract became more erratic, *see* Payment History, Def.'s Ex. B3 at 10-12, and the payments that were made came by telephone from plaintiff, rather than from Ms. Hunt, the real obligor, *see* Caldwell Aff., Def.'s Ex. B, ¶ 6.  All the while, defendant's demands for payment became increasingly persistent.  According to plaintiff, defendant made over 100 calls to his cell phone, which he used as his work phone, between 2008 and 2011.  Pl.'s Mot. at 2.  Plaintiff claims that he repeatedly told defendant over the phone that this was not his debt, that he was simply helping out his wife and son, that the number being called was a work number, and emphatically that defendant was to stop calling him on that phone.  *See* Hunt Dep., Pl.'s Ex. C, at 54. He claims that not only did defendant continue to make calls to him, it also called his mother, sister, ex-wife, daughter, and neighbors in efforts to contact or harass him.  *See* Pl.'s Mot. at 4-5.  In mid-2011, the situation apparently came to a head.  On July 18, 2011, Mr. Hunt made his last payment on the obligation of his wife and stepson.  Caldwell Aff., Def.'s Ex. B, ¶ 6.  There is no evidence of any payment on the contract by anyone after that date, although there was a substantial balance due at that time. The debt was mysteriously or miraculously paid off in full on September 30, 2011.  *See* Payment History, Def.'s Ex. B3, at 12. This enigma does not factor in this court's decision.

In August, 2011, the Hunts' resistance to defendant's calls became more organized. On August 8, 2011, Ms. Hunt sent defendant a certified letter demanding that defendant stop making unwanted telephone calls. Def.'s Facts ¶ 17. On December 18, 2011, Ms. Hunt brought suit against defendant in the Circuit Court of Jefferson County, Alabama, asserting federal claims under the TCPA and Federal Debt Collection Practices Act and stating several state law claims. That case was removed to this court, *see Hunt v. 21st Mortgage Corp.*, 2:12-CV-381-RDP, 2012 WL 3903783, at *1 (N.D. Ala. Sept. 7, 2012), and following mediation, was settled by the parties on November 11, 2012. This court guesses that defendant forgave the outstanding balance as part of its settlement with Ms. Hunt.

On August 14, 2012, plaintiff brought this suit. It is identical to the suit brought by his wife. The parties have completed discovery, and both now move for summary judgment.

**Discussion**

**I. Evidentiary Issues**

Before the court moves to the merits of the parties' cross motions, it must address defendant's motion to strike certain evidence on which plaintiff relies.

**A. Expert Testimony of Robert Biggerstaff**

Defendant first moves to strike the Expert Report of Robert Biggerstaff, Pl.'s Ex. G. Biggerstaff is a computer expert retained by plaintiff to examine defendant's telephone system and

to state his opinion as to whether defendant's system had the type of automatic dialing capabilities defined by the TCPA as an avenue to liability.  Defendant argues that this testimony is inadmissible because plaintiff failed to follow the disclosure requirements of Rule 26, F.R. Civ. P., and because Biggerstaff's testimony is not a proper subject of expert testimony under Federal Rules of Evidence ("FRE") 701-703.

Rule 26(a)(2) requires parties to make special disclosures in advance of trial if they wish to use expert testimony.  The party offering the expert must provide an "expert report" that includes, among other things, a list of all publications the expert has authored during the past 10 years, a list of all cases in which the expert has testified during the past four years, and a statement of the compensation to be paid the expert for his testimony.  Rule 26(a)(2)(B)(iii)-(v).  The report must be submitted at the time and in the sequence required by the court.  Rule 26(a)(2)(D).  If a party fails to meet these requirements, "the party is not allowed to use [the] information or witness to supply information on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Rule 37(c)(1), F.R. Civ. P.; *see also Reese v. Herbert*, 527 F.3d 1253, 1266 (11th Cir. 2008) ("Because the expert witness discovery rules are designed to allow both sides in a case to prepare their cases adequately and to prevent surprise, compliance with the requirements of Rule 26 is

not merely aspirational.") (quoting *Cooper v. S. Co.*, 390 F.3d 695, 728 (11th Cir. 2004)).

Mr. Hunt's expert disclosures were badly deficient. First, Biggerstaff's report was not submitted until December 6, 2013, the day upon which both parties filed their summary judgment motions and the last day upon which the said motions could be filed. Plaintiff correctly points out that meeting the court's original May 1, 2013 deadline for expert disclosures was impossible because defendant initially refused to allow plaintiff and his expert access to its facilities, and only eventually allowed access after this court granted plaintiff's motion to compel. But plaintiff fails to explain why this gave him *carte blanche* to ignore subsequent scheduling orders. The court extended discovery deadlines in its Order of September 17, 2013 (Doc. 31) in which the motion to compel was granted, and again in its Order of October 28, 2013 (Doc. 42) denying plaintiff's motion to reconsider the first opinion. The resulting discovery deadline was November 4, 2013, giving the plaintiff nearly seven weeks from the time the court granted the motion to compel to the time the expert report was due. Even if that time were insufficient, plaintiff could have moved for an extension of time before allowing the deadline to elapse. By simply attaching the expert report to his summary judgment motion with no explanation, plaintiff foiled entirely Rule 26's purpose of "allow[ing] both sides in a case to prepare their cases adequately

and [preventing] surprise," *Reeves*, 527 F.3d at 1266.

Even were the untimeliness of the expert report justified, plaintiff does not explain how defendant's initial refusal to allow access to its facilities can also explain plaintiff's failure to follow the other commands of Rule 26. Only in response to defendant's motion to strike did plaintiff hurriedly submit a list of other cases from the past four years in which Biggerstaff has testified, and still missing are a list of Biggerstaff's publications from the last 10 years and a statement of Biggerstaff's compensation in this case.

Because plaintiff failed to make the mandatory disclosures required by Rule 26, the expert report of Biggerstaff will be stricken and will not be considered by the court for purposes of these cross-motions. The court therefore need not address whether the report is a proper subject of expert testimony under the Federal Rules of Evidence.[2]

---

[2]The court will, however, note without decision that it is unimpressed by the portions of plaintiff's argument that gushingly endorse Biggerstaff as "a leading expert in TCPA cases," Pl.'s Reply at 21, "the administrator of [a] TCPA website," *id.* at 22, "a frequent commenter on TCPA rules," *id.*, having "qualifications as a TCPA expert [that] cannot reasonably be questioned," *id.*, and having "author[ed] and co-authored articles regarding the TCPA in law reviews and legal journals," *id.* at 23. The court gratefully accepts expert testimony on factual issues outside the scope of its own expertise, but does not require experts to help it with legal interpretation and application of statutes like the TCPA. *See Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) ("A[n expert] witness also may not testify to the legal implications of conduct; the court must be the jury's only source of law.")

### B.  Plaintiff's Deposition Testimony

Defendant next moves to strike portions of plaintiff's deposition testimony.  Under Rule 56(c)(2), F.R. Civ. P., "a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  According to defendant, plaintiff cannot testify that defendant called third parties on the telephone because that testimony is hearsay.

The court is skeptical that an objection framed in this way is appropriate at the summary judgment stage.  Defendant's motion to strike does not cite with specificity any statement or statements in plaintiff's deposition, but instead claims that **all evidence** concerning one important factual question, that is, the scope of defendant's calls to plaintiff's relatives and neighbors, must be excluded as hearsay.  But the fact that defendant made calls to plaintiff's relatives and neighbors is not only alleged in the complaint, Compl. ¶¶ 38-39, 42, but is supported by the admissible evidence contained in affidavits of two relatives who say they were called, *see* Pl.'s Exs. E, F.  This evidence provides the "genuine dispute as to any material fact," Rule 56(a), that must be resolved in the non-moving party's favor at this stage.  A more precise fact

---

(citation omitted); *see also In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) (collecting cases from all 12 circuits supporting "[t]he rule prohibiting experts from providing their legal opinions or conclusions").

finding on this fact issue must come from the jury, not the court. And the trial before a jury is a better place and time than here and now for the court to undertake a line-by-line review of testimony to screen it for admissibility.

## C.  Randall and Honkanen Affidavits

Defendant next argues that the affidavit testimony of Lauren Randall and Mary Honkanen, plaintiff's daughter and sister, respectively, that defendant placed calls to them must be excluded. Rule 56(c)(4) provides that "[a]n affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge." Defendant argues that the Randall and Honkanen affidavits fail this test because they "fail to state how these affiants . . . can identify that it was the [d]efendant who placed these calls." Def.'s Mot. to Strike ¶ 11. Defendant also claims, without explaining why, that the statements are hearsay. *Id.*

Each witness recalls receiving "at least one message on [her] home telephone answering machine stating the caller was attempting to contact Charles Hunt and telling [her] to tell Charles Hunt to call 21st Mortgage." Pl.'s Ex. E, ¶ 3; Ex. F, ¶ 3. "[H]ow these affiants have personal knowledge of these facts" is obvious to this court. Each witness went home, saw a blinking red light on her answering machine, pressed the "play" button, and listened to the message. Is defendant's theory that these messages were only prank

9

calls from a 21st Mtg. imposter?  Or that the witnesses are lying? Defendant is welcome to advance either theory at trial, but such arguments raise questions of credibility, not admissibility *vel non*.  Both witnesses had "personal knowledge" of what they said because their statements are personal recollections.  The witnesses' testimony is not hearsay because plaintiff seeks to prove only that the messages were left, not the truth of the information within the messages.  *See* Fed. R. Evid. 801 advisory committee's Note to Subdivision (c) ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay.").

## II.  **TCPA Claims**

With these evidentiary rulings in mind, the court turns to the merits of plaintiff's federal claim and pendent state claims. First is plaintiff's claim under the TCPA.  The claim arises under 47 U.S.C. §§ 227(b)(1) and (b)(3).  Section (b)(1) provides in relevant part:

> It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States--
>
> (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice--
>
> . . . (iii) to any telephone number assigned to a . . . cellular telephone service . . . .

Section (b)(3) provides a private right of action for each violation of this statute.

Defendant does not deny that it made calls to plaintiff's cellular telephone service, or that it did not have plaintiff's express consent or an emergency purpose. *See* Def.'s Mot. at 11. The only dispute is whether the calls were made using an "automatic telephone dialing system." Under the controlling statute, "[t]he term 'automatic telephone dialing system' means equipment which has the capacity--(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." § 227(a)(1).

In its Opinion and Order of September 17, 2013 (Doc. 31), this court joined the Ninth Circuit and a slew of district courts in holding that the liability question under the statute is whether telephone equipment used to place a call **could possibly be used** to store or produce numbers to be called using a random or sequential number generator, **not** whether the equipment was **actually** used in such a way to place the call or calls at issue. *See id.* at 6-10 (citing, *e.g.*, *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009)). However, the court pointed out that this definition logically must have some outer limit. Virtually every telephone in existence, given a team of sophisticated engineers working doggedly to modify it, could possibly store or produce numbers using a random or sequential number generator.

Furthermore, given the vast proliferation in recent years of smartphones with computer operating systems, many personal, non-commercial telephones could in all likelihood achieve automatic dialing capability by simply downloading an "app."  The TCPA surely does not mean to define **every** telephone as an automatic dialing system, and does not subject every call made to a cell phone to liability by the caller.  With this in mind, the court held that a telephone system is only covered by the statute if, **at the time the calls at issue were made**, the system had the capacity, **without substantial modification**, to store or produce numbers using a random or sequential number generator.  *See id.* at 9-10.  But what constitutes "substantial modification"?  Is this a fact question or a legal question?

The parties agree that the actual telephone system used to call Mr. Hunt's cell phone in this case was the Nortel Meridian Telephone System, Def.'s Facts ¶ 18; Pl.'s Opp'n at 18, and they appear to agree that the system would have automatic dialing capability if, but only if, certain software were installed. Unfortunately, the evidence offered by both parties concerning whether the software was in fact installed or could have easily been installed is wiggly and waffly.  Plaintiff relies on expert testimony that has been excluded.  *See* Pl.'s Opp'n at 21. Defendant, on the other hand, relies entirely on the conclusory, self-interested testimony of its own employees.  *See* Def.'s Facts

12

¶¶ 18-23.   And whatever criticism a fact-finder may have of defendant's self-interested testimony is enhanced by the fact that defendant dismantled its system and replaced it with a new system while the lawsuit of Ms. Hunt, plaintiff's wife, was pending and the changes were arguably in response to that suit which was settled.  *See* Collins Dep. of August 7, 2013, ECF No. 29-1, at 17-19.  Furthermore, the dismantled system has not been recreated so it cannot be examined as it existed while the complained of phone calls were being made.  Thus, there is and can be no opportunity at this junction to see the system in action, fully updated with whatever software defendant chose to install.

In light of these evidentiary shortcomings, both plaintiff and defendant have come to the conclusion that they win by default. *See* Pl.'s Opp'n at 31-32 ("[A]t least, [d]efendant should be estopped from asserting its former telephone system was not an automatic telephone dialing system due to its destruction and concealment of crucial evidence."); Def.'s Opp'n at 13 ("The relevant, admissible, undisputed evidence is clear--21st Mtg. did not have an 'automatic telephone dialing system' . . . .").  The court declines to adopt either fatalistic approach.  Instead, it concludes that the proper application of the statute can only be made by deciding questions of credibility and making reasonable deductions from the totality of circumstances.  The dispositive question, then, is whether defendant's employees are to be believed

when they say that the Nortel system, while up and running at the time defendant made calls to plaintiff's cell phone, did not contain and could not be modified to contain automatic dialing software, or whether there will emerge legitimate doubt about defendant's defense after its witnesses are tested by cross-examination and by the surrounding circumstantial evidence.   Of course there can only be a verdict in favor of plaintiff in the event the court should deny defendant's anticipated motion pursuant to Rule 50(a), F.R. Civ. P.  When that motion is assuredly filed, the court will have heard all of the evidence.

The making of credibility determinations is, of course, the exclusive domain of the jury, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."), and for that reason both parties' summary judgment motions will be denied as to the TCPA claim.

## II.  State Law Claims

In addition to his claim under the TCPA, plaintiff brings four state law claims.   The court, exercising supplemental jurisdiction,[3] must apply the law of Alabama to these claims.

### A.  Invasion of Privacy

---

[3]This court's jurisdiction over the state law claims has not been raised.  The court now notes that it has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

14

Plaintiff's first state law claim is for invasion of privacy. "Alabama has recognized the tort of 'invasion of the right to privacy,'" *Phillips v. Smalley Maint. Servs., Inc.*, 435 So. 2d 705, 708 (Ala. 1983)(citations omitted), including "the intrusion upon the plaintiff's physical solitude or seclusion," *id.*  In Alabama, the "Restatement (Second) of Torts, § 652B (1977), and its Comment, enunciate a clear and concise definition, and establish the perimeter, of the 'wrongful intrusion' tort." *Id.* at 708-09. Under this definition, a defendant is subject to liability if he intrudes "upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652B (1977); *see also Norris v. Moskin Stores, Inc.*, 272 Ala. 174, 177, 132 So. 2d 321, 323 (1961) (defining the tort as "the wrongful intrusion into one's private activities in such manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities") (internal emphasis and citation omitted).

The Alabama courts have not addressed directly whether this standard is to be applied as a question of law or of fact, but they appear to treat it as a mixed question following the same general pattern as negligence law.  The courts perform a gatekeeping role, determining whether the alleged privacy interest is a type protected by the law. *See, e.g., Johnston v. Fuller*, 706 So. 2d

15

700, 702-03 (Ala. 1997) (determining at summary judgment stage that a claim based on "voluntary interviews in which the defendants learned information already known to others . . . is not protected by the limited scope of the wrongful-intrusion branch of the invasion-of-privacy tort").  This court finds that defendant's telephone calls are of the kind that meet the Alabama definition of an invasion of privacy.  The jury, however, makes the final determination of whether a particular intrusion is sufficiently outrageous or offensive to a reasonable person to create liability. *See Cunningham v. Dabbs*, 703 So. 2d 979, 982 (Ala. Civ. App. 1997) ("[W]e hold that whether this conduct was severe enough to constitute an invasion of Cunningham's right to privacy is a question of fact to be determined by a jury."); *K-Mart Corp. v. Weston*, 530 So. 2d 736, 739 (Ala. 1988) ("It was within the jury's province to conclude that the plaintiff's desire for anonymity had been interfered with and that the defendant had intruded beyond the limits of decency."); *Jacksonville State Bank v. Barnwell*, 481 So. 2d 863, 866 (Ala. 1985) ("[T]he record raises issues of fact regarding whether the actions of [the defendant] constituted a campaign of harassment and were beyond the bounds of reasonableness, giving rise to liability for invasion of privacy.").

Repeated phone calls are one type of intrusion that can be protected against by Alabama law.  The Restatement, adopted as law

16

by Alabama, specifically notes that repeated phone calls can be an intrusion, though "only when the telephone calls are repeated with such persistence and frequency as to amount to a course of hounding the plaintiff." Restatement (Second) of Torts § 652B cmt. d.  In the debt collection context, the Alabama Supreme Court has held that "a creditor has a right to take reasonable action to pursue his debtor and [persuade] payment," *Norris*, 272 Ala. 174, 177, but that the action must be "reasonably related to a legitimate effort to collect the debt," *id.* at 178.  The debt collection effort must not rise to the level of a "'systematic campaign' of harassment," *id.*, or "a vicious attempt to coerce payment," *id.*  "Twenty-eight to thirty-five phone calls to one's home and place of employment fall within the realm of a 'systematic campaign of harassment.'" *Jacksonville State Bank*, 481 So. 2d at 866.  On the other hand, "a single letter written by the defendant-creditor to the plaintiff-debtor's employer merely notifying him of the debt [does] not constitute an actionable invasion of plaintiff's privacy." *Norris*, 272 Ala. at 177 (citation omitted).  Phone calls are more likely to be intrusive if the caller uses "coarse, inflammatory, malicious, and threatening language." *Jacksonville State Bank*, 481 So. 2d at 866.

Defendant's summary judgment motion fails for three reasons. First, defendant's calls were arguably more outrageous because plaintiff was not the debtor.  It was plaintiff's wife, and not

plaintiff, who owed this debt.  It is difficult to imagine that any effort to extract money from a person who does not owe it is a "legitimate effort to collect the debt." *Norris*, 272 Ala. at 178. Second, plaintiff says that defendant called him more than 100 times, many more than the 28-35 calls found sufficient to constitute an invasion in *Jacksonville State Bank*, 481 So. 2d at 866.  Finally, plaintiff has alleged that defendant called not only him, but his neighbors and relatives.  This increases the chance of causing "shame or humiliation to a person of ordinary sensibilities." *Norris* at 177.

Plaintiff's claim for partial summary judgment seeking a determination of liability in his favor is equally unavailing.  The exact number of calls made by defendant, as well as the number and identities of the people who were called, remains in dispute. Furthermore, defendant has presented evidence that its calls to plaintiff were part of a back-and-forth dialogue, with plaintiff calling defendant as often as it called him.  Finally, there is virtually no evidence that defendant used any "coarse, inflammatory, malicious, and threatening language," *Jacksonville State Bank*, 481 So. 2d at 866, and it appears that the conversations between the parties were mostly civil.  Given this context, it will be the task of the jury to resolve the factual disputes, and to determine ultimately whether defendant's actions were of the kind and degree to cause outrage or mental suffering to

18

a person of ordinary sensibilities and, if so, what damages to award. Therefore, both parties' motions for summary judgment will be denied as to the invasion of privacy claim.

**B. Negligence**

Plaintiff next raises a state law claim of negligence. To prove negligence in Alabama, plaintiff must show "(1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury." *Crowne Investments, Inc. v. Bryant*, 638 So. 2d 873, 878 (Ala. 1994) (citation omitted). The court has been unable to find a single authority for the proposition that a legal duty exists to refrain from making irritating phone calls. But even were plaintiff's negligence claim recast as a negligence per se claim based on a TCPA violation, or were a common law duty inferred from the privacy protections of various related laws, the claim would fail under the damages prong. "[T]he current state of Alabama law . . . limits recovery for emotional injury to those plaintiffs who sustain a physical injury as a result of a defendant's negligent conduct, or who are placed in immediate risk of physical harm by that conduct." *AALAR, Ltd., Inc. v. Francis*, 716 So. 2d 1141, 1147 (Ala. 1998). In this case, plaintiff alleges no physical injury or monetary harm, and seeks to recover only on the basis that "[t]he actions of 21st Mortgage directly and proximately caused [him] to suffer embarrassment and humiliation." Pl.'s Mot. at 15; *see also* Hunt Dep. at 150 ("That's

it, just emotional distress."). These types of damages cannot support plaintiff's negligence claim.

### C. Wantonness

A similar problem prevents plaintiff from going forward on his wantonness claim. Wantonness is "the conscious doing of some act or omission of some duty under knowledge of existing conditions, while conscious that from the doing of such act or omission of such duty injury will likely or probably result." *Sellers v. Sexton*, 576 So. 2d 172, 175 (Ala. 1991); *see* Ala. Code § 6-11-20 ("[Wantonness is c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others."). Though wantonness, once proven, can support a wider range of damages than negligence, the "injury" prong of the wantonness test mirrors the negligence definition. *See Terrell v. R & A Mfg. Partners, Ltd.*, 835 So. 2d 216, 229-30 (Ala. Civ. App. 2002) (applying *Francis* in a manufacturer liability case to bar "negligent-and/or-wanton manufacture" claims based on emotional distress alone); *Rawlings v. Dovenmuehle Mortgage, Inc.*, 64 F. Supp. 2d 1156, 1168 (M.D. Ala. 1999) (rejecting wantonness claim in mortgage servicing context because "from the sending of the default notices [that violated a federal statute] alone, injury was not likely to result"). In this case, defendant had no reason to expect that "injury [would] likely or probably result" from phone calls alone, and no physical or monetary injury did occur. Plaintiff's claim for wantonness fails.

20

### D.  Negligent Hiring and Supervision

Last is plaintiff's claim for negligent hiring and supervision.  Under this purported cause of action, "a master is held responsible for his servant's incompetency when notice or knowledge, either actual or presumed, of such unfitness has been brought to him." *Armstrong Bus. Servs., Inc. v. AmSouth Bank*, 817 So. 2d 665, 682 (Ala. 2001) (citations omitted).  "To sustain a claim for negligent or wanton hiring or supervision, training and/or retention, the plaintiff must establish that the allegedly incompetent employee committed a common-law, Alabama tort." *Leahey v. Franklin Collection Serv., Inc.*, 756 F. Supp. 2d 1322, 1328-29 (N.D. Ala. 2010)(citations and quotation marks omitted).  Thus, the tort of negligent hiring or supervision is not an entirely independent tort, but a somewhat bizarre extension of the doctrine of *respondeat superior*, seeking to hold a principal liable for the actions of its agent even when acting outside the scope of his employment.  *See Jones Exp., Inc. v. Jackson*, 86 So. 3d 298, 304-09 (Ala. 2010) (comparing negligent hiring and supervision with *respondeat superior* and rejecting argument that defendant corporation could be liable of "'independent' tort" of negligent hiring when jury verdict had found no liability by the employee).  In this case, defendant has not argued that its employees acted outside the scope of their employment.  Instead, defendant concedes that all of the actions complained of were its actions.  *See, e.g.,*

21

Def.'s Ex. B4 (using official company "Financial Counselor Notes" as evidence of all calls made). For that reason, the action of any employee who may have invaded plaintiff's privacy is attributed to defendant, so that the claim for negligent hiring and supervision is redundant and due to be dismissed.

**Conclusion**

For all the foregoing reasons, the three motions under consideration in this opinion are here being decided or will be separately decided as follows:

Defendant's motion to strike is GRANTED as to the expert report of Robert Biggerstaff, but DENIED as to the deposition testimony of plaintiff and the affidavit testimony of Lauren Randall and Mary Honkanen.

Defendant's motion for summary judgment will by separate order be denied as to plaintiff's TCPA claim and his invasion of privacy claim, but granted as to his negligence, wantonness, and negligent hiring and supervision claims.

Plaintiff's motion for summary judgment will be denied by separate order.

DONE this 4th day of February, 2014.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE