**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **CHARLES HUNT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.:** |
| | ) | **12-CV-2697-LSC** |
| **21st MORTGAGE CORPORATION** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S BRIEF IN SUPPORT OF HIS REQUEST FOR A JURY
CHARGE FOR SPOLIATION OF EVIDENCE**

COMES NOW, the Plaintiff, Charles Hunt, by and through counsel and hereby submits his brief in support of his request for the court to issue an adverse inference charge to the jury due to Spoliation of Evidence attached as Exhibit "A".

**I.     INTRODUCTION**

Plaintiff has asserted claims against the Defendant, 21st Mortgage Corp. for violations of the Telephone Consumer Protection Act 47 U.S.C. § 227, et seq. (TCPA) and claims for Invasion of Privacy.   Plaintiff's request for an adverse inference charge focuses on evidence relative to Plaintiff's TCPA claims.

Under the TCPA, it is "unlawful for any person… (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice." 47 U.S.C. §227(b)(1).   In his opinion denying

summary judgment, Judge Acker held, "[t]he only dispute is whether the calls were made using an "automatic telephone dialing system." Under the controlling statute, "[t]he term 'automatic telephone dialing system' means equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." *§ 227(a)(1)*. [Doc. 57, Memorandum Opinion and Order at *11].

## II.  <u>ARGUMENT</u>

"[T]he law imposes a duty upon litigants to keep documents that they know, or reasonably should know, are relevant to the matter." *Wilson v. Wal-Mart Stores, Inc.*, 2008 WL 4642596 (M.D. Fla. Oct. 17, 2008). A party has a duty to preserve potentially relevant evidence that that party has "access to and control over." *Nat'l Grange Mut. Ins. Co. v. Hearth & Home, Inc.*, 2006 WL 5157694 (N.D. Ga. Dec. 19, 2006). When a party fails to do this and destroys evidence, sanctions for spoliation are appropriate.

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Brown v. Chertoff*, 563 F. Supp. 2d 1372, 1377 (S.D. Ga. 2008).  When a party destroys or alters evidence, the district court has wide discretion to issue sanctions for the spoliation. *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 943 (11th Cir. 2005). One such sanction is for the court to issue an

adverse inference charge to the jury allowing the jury to presume that the destroyed evidence would have been harmful to the spoliator. *Id*. at 945. Spoliation also includes the intentional concealment of evidence. *Walter v. Carninval Corp.*, 2010 Dist. LEXIS 74307, 2010 WL 2927962, at *2 (S.D. Fla. July 23, 2010).

An adverse inference from the failure to preserve evidence is permitted when the spoliator has acted in bad faith. *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997). However, a party need not show that the spoliator acted maliciously in order for the court to find bad faith. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1310 (11th Cir. 2009).

Although federal law governs the imposition of spoliation sanctions, in diversity cases, federal courts routinely look to state law for guidance when the state law principles are consistent with the federal spoliation principles. *Flury*, 427 F.3d at 945; *see also Evans v. Mobile Cnty. Health Dep't*, 2012 WL 206141, at *10–11 (S.D. Ala. Jan. 24, 2012) (looking to Alabama law in deciding whether to impose sanctions for spoliation); Alabama law is "wholly consistent with federal spoliation principles," *see Flury*, 427 F.3d at 944,[1] and it permits an

---

[1] Alabama law largely tracks the Georgia law that the Eleventh Circuit said was wholly consistent with federal spoliation principles. *Flury*, 427 F.3d at 945; *see also Evans v. Mobile Cnty. Health Dep't*, 2012 WL 206141, at *11 n.18 (S.D. Ala. Jan. 24, 2012) (noting the similarity between Alabama and Georgia law on spoliation). Alabama courts consider "(1) the importance of the evidence destroyed; (2) the culpability of the offending party; (3) fundamental fairness; (4) whether alternative sources of the information are obtainable from the evidence destroyed; and (5) the possible effectiveness of other sanctions less severe than dismissal." *Story v. RAJ Props., Inc.*, 909 So. 2d 797, 802–03 (Ala. 2005).

adverse inference instruction if the court finds that the defendant knew that the evidence was important to the plaintiff's case and the defendant intentionally destroyed the evidence. See Ala. Pattern Jury Instructions 15.12.

Whether a spoliator's conduct warrants the imposition of sanctions is an issue of law for the court to decide. *See BP Prods. N. Am., Inc. v. Se. Energy Grp., Inc.*, 282 F. App'x 776, 780 n.3 (11th Cir. 2008). In fact, the Eleventh Circuit has even admonished a district court for issuing a "weak" instruction allowing the jury to balance the conduct of the parties instead of deciding whether to impose sanctions as a matter of law. *Flury*, 427 F.3d at 945–47.

Thus, spoliation sanctions (including adverse inference instructions) are warranted as a matter of law when a party intentionally destroys, or allows another to intentionally destroy, evidence that is important to the opposing party. For example, dismissal of the case was warranted when the plaintiff "ignored" the defendant's preservation-of-evidence letter and "allowed" evidence to be destroyed. *Flury*, 427 F.3d at 945. An adverse inference instruction was warranted when the defendant intentionally destroyed the evidence in a "mass purging" of documents seven months after the plaintiff had filed suit. *Brown v. Chertoff*, 563 F. Supp. 2d 1372, 1381 (S.D. Ga. 2008). And the exclusion of expert testimony was warranted when the plaintiff, who "had access and control over the evidence,"

---

allowed another to tamper with it. *Nat'l Grange Mut. Ins. Co. v. Hearth & Home, Inc.*, 2006 WL 5157694, at **5–7 (N.D. Ga. Dec. 19, 2006).

In addition, Alabama law states that the attempt to suppress evidence favorable to an adversary is sufficient foundation of inference of the party's guilt. In *May v. Moore*, the Alabama Supreme Court stated in pertinent part:

> Proof may be made concerning a party purposefully and wrongfully destroying a document which he knew was supportive of the interest of his opponent, whether or not an action involving such interest was pending at the time of the destruction. *See* Gamble, McElroy's Alabama Evidence, § 190.05 (3d ed.1977). Additionally, the spoliation, or <u>attempt to suppress material evidence</u> by a party to a suit, favorable to an adversary, is sufficient foundation for an inference of his guilt or negligence. *Southern Home Insurance Co. of the Carolinas v. Boatwright*, 231 Ala. 198, 164 So. 102 (1935); *see also*, Gamble, McElroy's Alabama Evidence, § 190.02 (3d ed.1977).

*May v. Moore*, 424 So.2d 596, 603 (Ala. 1982)[emphasis added].

A.    <u>21st Mortgage Intentionally Concealed Vital Evidence</u>

Throughout the discovery process Defendant intentionally concealed and attempted to hide the computer system it used to make calls to the Plaintiff. Indeed, from the time Defendant served its Initial Disclosures  throughout the <u>entire</u> paper discovery, Defendant contended its employees only used the "dummy phone module."

In its Initial Disclosures, Defendant only identified a manual for the "Nortel Meridian Modular Telephone" and not its computer system or the accompanying software. (Exhibit "B").  In Defendant's responses to Interrogatories requesting

information regarding "all machines by model, supporting system… used to make any telephone call in connection with plaintiff…," Defendant only identified the Nortel Meridian Modular Telephone system. (Exhibit "C').   In its responses to Plaintiff's 2nd Interrogatories served on Plaintiff on July 15, 2013, Defendant admitted that it used a computer system in connection with its phone, but represented that it was "<u>not</u> [] linked to the telephone system directly."(Exhibit "D").

Defendant trumpeted this as the sum and substance of the phone system in response to Plaintiff's written discovery. Yet, it was not until Plaintiff deposed 21st Mortgage's Network Administrator, Jim Collins, that it finally came to light that there was more to Defendant's telephone system than the "dummy telephone" module. Collins testified that the phones were connected to a mainframe computer "similar to a server [] on a hard drive with its own, you know, CPU ram, memory, so on and so forth." (Exhibit "E," Collins Depo. p.28). Collins further characterized the mainframe as the "brain" of the entire phone system and the "Nortel Meridian Modular Telephones" as just "dummy units" that have no capabilities without being connected the mainframe.(Exhibit "E," Collins Depo. p.32:22-24).

Granting Plaintiff's motion to compel, Judge Acker noted, "defendant was wrong not to disclose this information earlier, and doubly wrong to apparently

offer the hardware for sale, rather than preserving it for purposes of this litigation." Defendant's efforts to conceal the system evidence bad faith as opposed to a mere mistake or negligence in spoiling evidence.

**B.      Defendant failed to preserve the telephone system.**

In this instance, Defendant knew it had a duty to retain the computer and phone system, yet it failed to do so. Collins, as Network Administrator, was the person at 21st Mortgage responsible for switching out the telephone system and was the one who should have been instructed to place a litigation hold on the system. Nevertheless, Collins testified that he was never instructed to put a litigation hold on the telephone system at issue, although Defendant knew it was the subject of ongoing litigation at the time the telephone system was replaced. (Exhibit "E," Collins Depo. pp. 19:24-20:18). Defendant intentionally did not do so even with the knowledge of ongoing litigation involving the subject telephone system. (*Id.* p. 20:11-14). Collins testified he did not even know about the instant litigation until the week of his deposition. (*Id.* p. 20:4-18).

The companion case of *Amelia Hunt v. 21st Mortgage Corp.*, 2:12-CV-381-RDP, involved Plaintiff's wife, represented by the undersigned and the same counsel for 21st Mortgage. That case involved, among other claims, the same claim made in this case, that 21st Mortgage had violated the TCPA. Amelia Hunt's lawsuit was filed December 8, 2011, well before the telephone systems were

changed, on August 7, 2012, yet Defendant failed to ever provide notice to Plaintiff of the change.

The old phone system is crucial to Plaintiff's claim as Plaintiff's expert needed to examine it in a live state to form his opinions regarding its capacity to act as an ATDS. Plaintiff has been irrevocably and significantly prejudiced. Plaintiff's expert, Robert Biggerstaff states in his report that he was unable to view the system in live operation to see exactly how it was used by 21st Mortgage. [Doc. 44-11, Expert Report of Biggerstaff, p.6 ¶ 13, p.7 ¶16]. It was crucial to Plaintiff's claims in this matter that the telephone system at issue was kept in live operation until, at least, he had a chance to inspect the system while it was live.

As Judge Acker later noted in his Memorandum opinion denying summary judgment,

> whatever criticism a fact-finder may have of defendant's self-interested testimony is enhanced by the fact that the defendant dismantled its system and replaced it with a new system while the lawsuit of Ms. Hunt, plaintiff's wife, was pending and changes were arguable in response to that suit which was settled… Furthermore, the dismantled system has not been recreated so it cannot be examined as it existed while the complained of phone calls were made.  Thus there is and can be no opportunity at this junction to see the system in action, fully updated with whatever software defendant chose to install.

[Doc. 57 * 13].

Finally, in denying Defendant's Motion to Exclude the testimony of Plaintiff's expert, Judge Acker stated,

"[t]he court grows increasingly frustrated with defendant's arguments that Biggerstaff had insufficient data because he did not see the old system in its live state, along the of…" … In fact, the Shortel system does have relevance to this matter, namely that defendant installed the Shortel system in place of the old system immediately after plaintiff's wife brought a TCPA lawsuit, thus flagrantly destroying evidence crucial to this case and practically begging the court for spoliation sanctions. The court generously attributed this destruction to mere stupidity, rather than willfulness, and therefore permitted defendant to cover it error simply by providing plaintiff access to the dismantled equipment in as close to its previous condition as possible…The court regrets its generosity more and more with each new round of briefing in which defendant gleefully uses its now spoliation efforts as an argument for why it must win."

[Doc. 67 fn. 4 *11-12].

Plaintiff has been prejudiced by his and his expert's inability to examine the phone and computer system in a live state and as they existed before they were taken off line. As Judge Acker found, the prejudice cannot and was not able to be cured. Under the third prong of *Flury*, the evidence that was destroyed was of vital importance as the system's capabilities go to the heart of plaintiff's case.

Under the fourth prong, good versus bad faith, while Defendant may have long had plans to replace the system, it was well aware of Amelia Hunt's TCPA claims and its own assertions that the system had no such capabilities to act as an ATDS. Thus, bad faith can be inferred from Defendant's failure to preserve the evidence and allow Plaintiff an opportunity to inspect it before it went off line and was replaced. Further, Defendant's subsequent repeated arguments, taking advantage of the fact that the evidence was destroyed evidence this bad faith.

Finally, this court need look no further for the potential for abuse than Judge Acker's opinion summarizing defendant's attacks on the Plaintiff's expert opinions based significantly on his inability to observe the system prior to its spoliation as "thus flagrantly destroying evidence crucial to this case and practically begging the court for spoliation sanctions." [Doc. 67 fn. 4 *11-12].

WHEREFORE, PREMISES CONSIDERED, Plaintiff moves this Honorable Court to give the spoliation jury instruction attached hereto as Exhibit A, and for such other and further relied as the Court may deem appropriate.

Respectfully submitted this 14th day of November , 2014.

/s/Wesley L. Phillips
Wesley L. Phillips
PHILLIPS LAW GROUP, LLC
 Post Office Box 362001
Birmingham, Alabama 35236
Telephone: (205) 383-3585
Facsimile: (800) 536-0385
wlp@phillipslaw.com

s/ M/ Stan Herring
John G. Watts (ASB-5819-t82j)
M. Stan Herring (ASB-1074-n72m)
Watts & Herring, LLC
301 19th Street North
Birmingham, Alabama 35203
(205) 879-2447
(888) 522-7167 facsimile
john@wattsherring.com
stan@wattsherring.com

**Attorneys for Plaintiff**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the above and foregoing document has been served on all parties/attorney(s) of record via either U.S. Mail, postage prepaid, electronic mail, facsimile, and/or electronic mail through the ECM/CF system this **14th** day of **<u>November</u> , 2014.**

David M. Wilson
James E. Mitchell, Jr.
WILSON & BERRYHILL
One Metroplex Drive, Suite 250
Montgomery, Alabama 35209

/s/M. Stan Herring
OF COUNSEL

# EXHIBIT

# "A"

## Exhibit A

## Spoliation

In this case, Charles Hunt claims that the 21st Mortgage Corporation destroyed, altered, failed to preserve or otherwise tampered with material evidence to be used by Charles Hunt to prove his claims that 21st Mortgage Corporation violated the Telephone Consumer Protection Act. Charles Hunt claims 21st Mortgage Corporation destroyed, altered, failed to preserve or otherwise tampered with material evidence to be used by Charles Hunt to prove his claims. The material evidence was 21st Mortgage Corporation's telephone and computer system it used to contact Charles Hunt by telephone at all times relevant to Charles Hunt's claims in this case. If you are reasonably satisfied from the evidence that 21st Mortgage Corporation failed to preserve or did or attempted to wrongfully destroy, alter, or otherwise tamper with its telephone and computer system used to contact Charles Hunt, and that this evidence is relevant, then you may infer that 21st Mortgage Corporation destroyed its telephone and computer system used to contact Charles Hunt because the evidence was unfavorable to 21st Mortgage Corporation and did not support its claims or defenses that it did not violate the Telephone Consumer Protection Act when calling Charles Hunt.

*Flury v. Daimler Chrysler Corp.*, 427 F. 3d 939 (11th Cir. 2005).
*Ladner v. Litespeed Mfg. Co.*, 537 F. Supp. 2d 1206 (N.D. Ala. 2008).
*Brown v. Chertoff*, 563 F. Supp. 2d 1372 (S.D. Ga. 2008).
*May v. Moore*, 424 So.2d 596, 603 (Ala. 1982).

# EXHIBIT

# "B"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| CHARLES HUNT, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | CASE NO.: 2:12-cv-2697-WMA |
| | ) | |
| 21ST MORTGAGE CORPORATION, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## INITIAL DISCLOSURES

COMES NOW Defendant, 21st Mortgage Corporation pursuant to <u>Fed. R. Civ. P.</u> 26(a)(1), and makes its Initial Disclosures as follows:

A. The following individuals are likely to have discoverable, non-privileged information that the Defendant may use to support its defenses:

1. Plaintiff, Charles Hunt is likely to have discoverable information concerning his claims and alleged damages;

2. Amanda Wolfe, 21st Mortgage Corporation, 620 Market Street, Knoxville, Tennessee 37902; (800) 955-0021, is likely to have discoverable information regarding Defendant's policies, practices, procedures, telephone system, accounts and/or business records.

3. Walden Buttram, 21st Mortgage Corporation, 620 Market Street, Knoxville, Tennessee 37902; (800) 955-0021, is likely to have discoverable information regarding Defendant's practices, policies, procedures, account for loan number 96651 and/or business records.

B. The following is a description of all documents, electronically stored information, and tangible things that the Defendant has in its possession, custody, or control and may use to support its claims or defenses:

1. Phone logs. These documents and/or electronically stored information are located at 21st Mortgage Corporation, 620 Market Street, Knoxville, Tennessee

37902. These documents and/or electronically stored information will be made available for inspection and copying upon request;

2. Nortel Meridian Modular Telephone user manual, a copy of which is attached hereto and stamped C. HUNT 1 through 26;

3. October 31, 2010, November 30, 2010, January 5, 2011, February 4, 2011, February 17, 2011, May 23, 2011 and July 18, 2011 letters to Charles Hunt from 21st Mortgage Corporation which are attached hereto and stamped C. HUNT 27 through 34.

C. Defendant is not claiming damages.

D. Defendant does not have an insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in this action or to indemnify or reimburse for payments made to satisfy any possible judgment.

/s/ James E. Mitchell, Jr.
DAVID M. WILSON (ASB-1797-N71D)
JAMES E. MITCHELL, JR. (ASB-9127-E62M)
Attorneys for the Defendant
21st Mortgage Corporation

OF COUNSEL:
WILSON & BERRYHILL P.C.
One Metroplex Drive
Suite 250
Birmingham, Alabama 35209
Telephone (205) 252-4441
Facsimile (205) 252-0320
david@wilsonberryhill.com
jimmy@wilsonberryhill.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon all Counsel of Record in this cause by e-mail and by placing a copy of same, properly addressed and postage paid, in the U. S. Mail on this the 21st day of November, 2012.

Wesley Phillips, Esquire
Phillips Law Group, LLC
P.O. Box 130488
Birmingham, Alabama 35213

/s/ James E. Mitchell, Jr.
Of Counsel:

# EXHIBIT

# "C"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| CHARLES HUNT, | ) |
| | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| | ) |
| v. | ) CASE NO.: 2:12-cv-2697-WMA |
| | ) |
| 21ST MORTGAGE CORPORATION, | ) |
| | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT 21ST MORTGAGE CORPORATION

COMES NOW the Defendant, 21st Mortgage Corporation, and in response to the Plaintiff's First Set of Interrogatories, sets down and assigns as follows:

1. State whether this Defendant's name is correctly stated in the complaint filed in this case. If not, state the correct way this defendant should be designated as a party defendant in the named action at the time of occurrence made the basis of this lawsuit and at the time of response to these interrogatories.

   **RESPONSE:** **Yes.**

2. State the corporate history of this Defendant, including the date and place of incorporation; whether it is qualified to do business in the State of Alabama, and, if so, the date first qualified; the address of its principal place of business; and the full names of any and all subsidiaries, divisions, sister corporations, parent corporations, successors, assigns and other like entities.

   a. State the address of all business locations of this Defendant;

   b. Describe the nature of this Defendant's business.

   **RESPONSE:** **Defendant is a Delaware Corporation, incorporated on August 15, 1995. Defendant is qualified to do business in the State of Alabama and has been qualified since April 10, 1997. Its principal place of business is located at 620 Market Street, Knoxville,**

**procedures, and periodic continuing education including FDCPA training twice a year.**

16. State the name, position of employment, address and telephone number of all persons who have had any responsibility for or who have taken any action with regard to the collection of the account which is the subject matter of this cause.

    **RESPONSE:        Defendant objects to this interrogatory as it is not reasonably calculated to lead to the discovery of admissible evidence. Defendant states that there is no "account which is the subject matter of this cause."**

17. Identify the custodians of the records, including name, address and phone number that would show all entries regarding the flow of funds regarding the subject account.  If this person does not have personal knowledge of the transaction, then please identify in like fashion the person who worked for your company and had custody of the accounting or bookkeeping registers or records identifying said flow of funds.  Flow of funds, means (a) any record of money received, (b) any record of money paid out and (c) any bookkeeping or accounting entry, general ledger and accounting treatment of the subject loan transaction at your company including but not limited to whether the subject account transaction was ever entered into any category on the balance sheet at any time or times.

    **RESPONSE: Defendant objects to this interrogatory as it is not reasonably calculated to lead to the discovery of admissible evidence. Defendant states that there is no "subject account."**

18. For each request for admission you denied or to which you did not give an unqualified "admitted," please state in detail the basis for each such refusal to admit and identify all documents which relate to your refusal to admit.

    **RESPONSE:        Defendant's responses to Plaintiff's Request for Admissions are self explanatory.**

19. Identify all machines by model, supporting system and dates/time used that were used to make any telephone call in connection with plaintiff, including calls to Plaintiff's husband, friends, and relatives.

    **RESPONSE:        Defendant objects to this interrogatory as it is not reasonably calculated to lead to the discovery of admissible evidence. Further, Defendant does not know the identity of Plaintiff's husband, friends or relatives (with the exception of his wife, Amelia Hunt) and therefore cannot appropriately respond to this interrogatory. However, without waiving any objection contained herein, at all relevant times, Defendant utilized the Nortel Meridian Modular Telephone system.  Please refer to the Nortel Meridian Modular**

**Telephone user manual, a copy of which was attached to Defendant's initial disclosures and stamped C. HUNT 1 through 26.**

20. State the name, employer, most current home address, title and job description of each person (including present or former third parties, officers and/or employees) who is responsible for your telephony systems and operations, and state specifically what that person's duties with respect to telephony are.

     **RESPONSE:** **Jim Collins, network administrator whose duties are network administration. Defendant objects to providing Mr. Collins most current home address on privacy grounds.**

21. Explain how you obtained Plaintiff's cellular telephone numbers.

     **RESPONSE:** **Defendant does not distinguish between cellular telephone numbers and any other type of telephone number and therefore does not know whether it obtained Plaintiff's cellular telephone numbers.**

22. Explain how you obtained Plaintiff's mother's and daughter's cellular telephone numbers.

     **RESPONSE:** **Defendant does not know the identity of Plaintiff's mother or daughter. Further, Defendant does not distinguish between cellular telephone numbers and any other type of telephone number. Therefore Defendant does not know whether it ever obtained Plaintiff's mother's and daughter's cellular telephone numbers.**

23. Identify and explain all policies, practices and procedures regarding use of automatic dialing systems and the complete history of each. Please include a detailed description of policy, practices or procedure the date it was first considered, the date it was implemented, all persons involved in its consideration, implementation and, if applicable, termination. Please respond to this interrogatory without regard to time; in other words, disregard the time frame set forth in the instruction for these requests.

     **RESPONSE:** **Defendant does not have an automatic dialing system.**

24. Identify and explain all policies, practices and procedures regarding calls made by you to cellular telephones and the complete history of each. Please include a detailed description of policy, practices or procedure, the date it was first considered, the date it was implemented, all persons involved in its consideration, implementation and, if applicable, termination.

     **RESPONSE:** **Defendant objects to this interrogatory as it is overly broad, unduly burdensome and not reasonably calculated to lead to**

21ST MORTGAGE CORPORATION

By: _Amanda Wolfe_

Its: _Litigation Coordinator_

Subscribed and sworn to before me this the ___1___ Day of _February_, 2013.



_Linda C. McPheron_
Notary Public

My Commission Expires: _11/2/16_

DAVID M. WILSON (ASB-1797-N71D)
JAMES E. MITCHELL, JR. (ASB-9127-E62M)
Attorneys for the Defendant
21st Mortgage Corporation

OF COUNSEL:

WILSON & BERRYHILL P.C.
One Metroplex Drive
Suite 250
Birmingham, Alabama 35209
Telephone (205) 252-4441
Facsimile (205) 252-0320
david@wilsonberryhill.com
jimmy@wilsonberryhill.com

## CERTIFICATE OF SERVICE

    I hereby certify that a copy of the foregoing has been served upon all Counsel of Record in this cause by e-mail and by placing a copy of same, properly addressed and postage paid, in the U. S. Mail on this the 4th day of January, 2013.


Wesley Phillips, Esquire
Phillips Law Group, LLC
P.O. Box 130488
Birmingham, Alabama  35213

_____
Of Counsel:

# EXHIBIT

# "D"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **CHARLES HUNT,** | ) |
| | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| | ) |
| **v.** | ) **CASE NO.: 2:12-cv-2697-WMA** |
| | ) |
| **21ST MORTGAGE CORPORATION,** | ) |
| | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

---

**DEFENDANT'S RESPONSE TO PLAINTIFF'S SECOND SET OF**
**INTERROGATORIES TO DEFENDANT 21ST MORTGAGE CORPORATION**

---

COMES NOW the Defendant, 21st Mortgage Corporation, and in response to the Plaintiff's Second Set of Interrogatories to Defendant 21st Mortgage Corporation sets down and assigns as follows:

28.    Identify and describe each communication, or attempted communication, between you with Plaintiffs, or any other person, which is in any way related to your attempts to contact Plaintiff, by stating the following:

   (a)    The name of the individual initiating communication;

   (b)    The name of the person and/or description of the person to whom the communication was directed;

   (c)    The date and time of the communication;

   (d)    The method of communication (e.g. letter, phone call, in-person);

   (e)    A detailed description of the substance of the communication, (do not simply refer to notes);

   (f)    Identification of all witnesses to or participants in the communication; and,

   (g)    Any actions taken by you as a result of the communication.

**RESPONSE:** Defendant objects to this interrogatory to the extent that it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence and to the extent that it is beyond the scope of discovery allowed by Federal Rules of Civil Procedure 26 and 33. However, without waiving any objection contained herein, pursuant to the authority of Federal Rule of Civil Procedure 33(d), please refer to Financial Counselor notes (stamped C. Hunt 35-99) previously produced as well as, and in conjunction with, the following current and former employees of Defendant and corresponding identification number which identifies all information maintained by Defendant regarding said communications.

1. Justin Belcher (3615);

2. Kevin Bunch (3427);

3. Chip Fisher (3510);

4. Ericah Wilson (2730);

5. Barrett Utley (3126);

6. Natalie McCarroll (2936);

7. Emily Bridges (3271);

8. Shawn Cupp (2938);

9. Eileen Casper (3065);

10. Fred Campbell (2965);

11. Tim Holt (2257);

12. Jessica Slayton (3031);

13. Lisa Morrell (3151);

14. Alex Sauls (3343);

15. Ryan Goode (3219);

16. Amanda Robertson (3087);

17. Kellen Bridges (3074);

18. Bailey Anglin (2768);

19. Kevin Goodman (2744);

20.     Kevin Hunley (2932);

21. Amanda Green (2437);

22.     Amy Rickett (2829);

23.     Teresa Lambert (2626);

24.     Jenna Byrne (2376); and

25.     Adam Hogan (2249).

**Further, Defendant refers Plaintiff to the October 31, 2010, November 30, 2010, January 5, 2011, February 4, 2011, February 17, 2011, May 23, 2011 and July 18, 2011 letters to Charles Hunt from 21st Mortgage Corporation (stamped C. HUNT 27 through 34) which contain the names and subject of communications therein.**

29.     Identify and describe fully and all software that you use, or have used in the past ten (10) years, to contact any persons with relation to accounts collected by you, including, but not limited to, software used in conjunction with operating your telephone system, including, but not limited to, making calls to said persons.

**RESPONSE:     Defendant objects to this interrogatory to the extent it is overly broad, vague, ambiguous and not reasonably calculated to lead to the discovery of admissible evidence.   This Defendant also objects to the extent this interrogatory requests this Defendant to disclose confidential, private, and proprietary corporate policies and procedures.   However, without waiving any objection, Defendant states that its computer system uses the AS400 platform, but it does not have the capacity to record oral communications with a debtor or third-party nor is it linked to the telephone system directly. The AS400 allows users to mechanically enter notes by employees of this Defendant.    A copy of these notes has been produced by this Defendant (see documents stamped C. Hunt 35-99).**

30.     State whether you use, or have used in the past ten (10) years, any type or kind of call center or any other third party service of any type or kind to initiate, answer or handle telephone calls to and from you in any way, and if so, identify all such call centers and third party services you presently use or have used by you in the past ten (10) years.

**RESPONSE:     No.**

21ST MORTGAGE CORPORATION

_Jelly Valker_

By: _Jeffrey Warkins_

Its: _Litigation Coordinator_

Subscribed and sworn to before me this the __15th__ Day of __July__, 2013.



_Autumn L Anderson_
Notary Public

My Commission Expires: __11-10-2013__

_____

DAVID M. WILSON (ASB-1797-N71D)
JAMES E. MITCHELL, JR. (ASB-9127-E62M)
Attorneys for the Defendant
21st Mortgage Corporation

**OF COUNSEL:**

WILSON & BERRYHILL P.C.
One Metroplex Drive
Suite 250
Birmingham, Alabama 35209
Telephone (205) 252-4441
Facsimile (205) 252-0320
david@wilsonberryhill.com
jimmy@wilsonberryhill.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon all Counsel of Record in this cause by e-mail and by placing a copy of same, properly addressed and postage paid, in the U. S. Mail on this the 15th day of July, 2013.

Wesley Phillips, Esquire
Phillips Law Group, LLC
P.O. Box 130488
Birmingham, Alabama  35213

_____
Of Counsel:

# EXHIBIT

# "E"

Exhibit A

FILED
2013 Sep-06  PM 04:40
U.S. DISTRICT COURT
N.D. OF ALABAMA



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CHARLES HUNT,                        )
                                     )
            Plaintiff,               )
                                     )
vs.                                  ) No. 2:12-CV-2697-WMA
                                     )
21ST MORTGAGE CORPORATION,           )
                                     )
            Defendant.               )


APPEARANCES:


            Wesley L. Phillips
            Attorney for the Plaintiff


            James E. Mitchell, Jr.
            Jeff Warkins
            Attorneys for the Defendant


            DEPOSITION OF JIM COLLINS

            August 7, 2013


_____


            Watts-Boyd Reporting Agency
            in Association with
            Kathy E. Holt, CCR, LCR
            P.O. Box 30205
            Knoxville, TN 37930-0205
            Phone (865) 288-3962
            Fax   (865) 288-3963
            Cell  (865) 604-3681
            www.wattsboyd.com

1                    INDEX TO TRANSCRIPT

2
   WITNESS                                          PAGE
3

4                         JIM COLLINS

5
        Examination by Mr. Phillips              3
6       Examination by Mr. Mitchell             33
        Examination by Mr. Phillips             34
7       Examination by Mr. Mitchell             35

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2                        STIPULATION
 3          The pretrial deposition of JIM COLLINS, witness
 4   for the Plaintiff, taken upon notice, for any and all
 5   purposes allowable under the Federal Rules of Civil
 6   Procedure, before Kathy E. Holt, LCR No. 327, Certified
 7   Court Reporter and Notary Public at Large, on the 7th
 8   day of August, 2013, at the law office of Pratt Aycock,
 9   705 Gate Lane, Suite 202, Knoxville, Tennessee.
10   (Mr. Warkins not present)
11                        JIM COLLINS,
12          having been first duly sworn, was examined and
13          deposed as follows:
14                        EXAMINATION
15   BY MR. PHILLIPS:
16          Q     Please state your name for the record.
17          A     Jim Collins.
18          Q     Mr. Collins, have you given deposition
19   testimony before?
20          A     No.
21          Q     Is this your first deposition?
22          A     Yes.
23          Q     Okay.  Let me just give you a quick
24   what we call the ground rules.  Pretty simple.  I'm
25   going to ask you questions; you answer my questions I
```

1          Q       And you said it was not put live.

2    What do you mean by that?

3          A       We did not do a one-for-one

4    switch-over until August 11th.

5          Q       What is a one-for-one switch-over?

6          A       One system goes down, one system comes

7    up.

8          Q       Okay.  And what was going on in

9    between -- from the middle of July 2012 until August

10   11th, 2012, for the system?

11         A       For the reason why it didn't go up?

12         Q       Yeah.  I mean, what was happening?

13   You said it was -- the hardware was installed.  What was

14   going on with the other one.

15         A       We had carrier-related issues.  They

16   didn't install the correct interface from internal to

17   external.

18         Q       Who is your carrier?

19         A       Windstream.

20         Q       W-i-n-s-t-r-e-a-m (sic)?

21         A       Yes, sir.

22         Q       Okay.  So none of your collectors

23   could use that system until August 11th, 2012?

24         A       Correct.

25         Q       Okay.  During the process from July

1    2012 to August 11th of 2012, did -- were all the

2    units -- they took new units for the new system.  Right?

3            A       Correct.

4            Q       Were all the units discarded at once

5    or was it one at a time or was it in phases or what?

6            A       As far as the Nortel system coming off

7    the floor?

8            Q       Yes.

9            A       It took a couple -- sort of a week to

10   take them off the floor, but they were inactive at the

11   time, during that week period.

12           Q       Okay.

13           A       You could not make an outbound call

14   off those.

15           Q       Okay.  So that was -- that week

16   period, that was the middle to late July of 2012?

17           A       So from whatever the weekend of August

18   11th to --

19           Q       Oh, okay.  Okay.  So that week started

20   on August 11th --

21           A       Uh-huh.

22           Q       -- and went to, like, August 18th?

23           A       Correct.

24           Q       Okay.  During the process of the

25   changeover, did anyone ever tell you not to discard the

1   other phone system because it was involved in

2   litigation?

3           A       Was never told anything about it.

4           Q       Okay.  So you never had any

5   information about that phone system being subject to

6   litigation?

7           A       Not until I was told to appear here.

8           Q       Okay.  And you were network

9   administrator during that time period as well?

10          A       Yes, sir.

11          Q       Were you -- would you have been the

12  point of contact to be told to hold onto that phone

13  system?

14          A       Yes, sir.

15          Q       So your first knowledge that that

16  phone system was involved in litigation occurred this

17  week?

18          A       Yes, sir.

19          Q       Okay.  Do you know anything about the

20  AS400 system?

21          A       Very little.

22          Q       What's your knowledge of it?

23          A       I can enable a password.

24          Q       Do you know how it interacts with the

25  telephone system?

Page 21

1          A      No, sir.

2          Q      Okay.  The old phone system, the

3   Nortel Meridian system -- which I'm assuming you're

4   saying this is representative of that system right here?

5          A      Yes, sir.

6          Q      About approximately how many units did

7   you have?

8          A      Roughly 500.

9          Q      What happened to those 500 units?

10         A      They are currently sitting up in

11  storage in the penthouse until sale.

12         Q      Okay.  So you still have possession of

13  them?

14         A      Minus 200.

15         Q      Okay.

16         A      We were able to sell off 200 of them.

17         Q      Okay.  So you have 300 units still

18  sitting in storage?

19         A      Yes, sir.

20         Q      Okay.  Is that at your headquarters

21  at -- on Market Street?

22         A      Yes, sir.

23         Q      Are they in substantially the same

24  condition as when you took them out?

25         A      Yeah.

1    structures, just the gamut of what you would need to --

2    for the basic skills of managing that system.

3              Q      Okay.  Was -- other than -- was any of

4    that software based on what we've already talked about?

5              A      All Nortel software based.

6              Q      All Nortel software based?

7              A      Correct.

8              Q      Okay.  Did you use any Nortel software

9    on the phone system you had installed up through August

10   of 2012?

11             A      Up until the point that we cut -- we

12   killed it.

13             Q      What kind of software did you use on

14   the phone system then up to that point?

15             A      No, no, no.  I'm sorry.  It was only

16   Nortel.

17             Q      Right.

18                    I'm saying did you use any Nortel

19   software with the system or any software with the system

20   to that point?

21             A      Whatever -- I don't -- what was it

22   called?  OTM 5.O.  I can't remember what the acronym

23   stands for.  It's telephony manager.

24             Q      Okay.  And just generally speaking

25   what does that do -- does that software do?

```
 1              A         It just allows you to facilitate

 2     program changes.

 3              Q         And when you say "program changes,"

 4     can you elaborate for me some?

 5              A         Program changes as far as, you know,

 6     again, ads, moves, changes, group structures, so on and

 7     so forth.

 8              Q         Okay.  Now -- and that software -- how

 9     is that software -- is that within a chip in the system

10     itself or how is that software installed and

11     controlled -- the system controlled by it?

12              A         Similar to a server --

13              Q         Uh-huh.

14              A         -- on a hard drive with its own, you

15     know, CPU ram, memory, so on and so forth.

16              Q         So these phones were hooked up to a

17     centralized server?

18              A         Main frame.

19              Q         Main frame.  Okay.

20                        And so this main frame, that's where

21     you could program all its capabilities for the phone.

22     Correct?

23              A         Correct.

24              Q         Okay.  And that would have included an

25     automatic dialer, too?
```

1          A          It did not have an automatic dialer.

2          Q          Right.

3                     But I'm saying that would have

4     included an automatic dialer software as well?

5                     MR. MITCHELL:  Objection to the form.

6     BY MR. PHILLIPS:

7          Q          You can answer.

8          A          I'm sorry.  What -- can you repeat

9     that?

10         Q          Yes.  I'm saying from that main

11    frame --

12         A          Right.

13         Q          -- if you had purchased the software

14    to -- for that phone to use the capability it had to do

15    automatic dialing, you would have plugged into that main

16    frame.  Correct?

17         A          It would have to be installed in the

18    main frame.

19         Q          Okay.  And then that would have given

20    all the phones the capability to do automatic dialing?

21         A          If it was installed.

22         Q          Okay.  Got you.

23                    Where was that main frame located?

24         A          At headquarters.

25         Q          Do you still have that main frame?

```
 1          A       Correct.

 2          Q       Where is it located now?

 3          A       At headquarters on the floor in its

 4  phone closet.

 5          Q       Is it still in use?

 6          A       It's powered off and has been since

 7  August 11th.

 8          Q       Okay.  You can get to that main frame?

 9          A       Yes, sir.

10          Q       Okay.  How long -- what was the

11  service dates of that main frame?  What were service

12  dates of that main frame?

13          A       I don't know when the beginning of it

14  was because I came in after the fact --

15          Q       Okay.

16          A       -- but it was -- the service date was

17  up to August 11th.

18                  (Mr. Warkins entered room)

19          Q       So it was at least 2005 to 2012?

20          A       At least before 2004.

21          Q       Before 2004?

22          A       Uh-huh.

23          Q       Okay.  Has it got any type of

24  identifying -- has it got a serial number or anything

25  like that on it?
```

```
 1              A      Yes, sir.

 2              Q      I'm assuming you don't know it

 3     offhand.  Can you tell me -- tell me this.  Do you know

 4     what the brand, make, and model of it is?

 5              A      It's a CS1000.

 6              Q      CS1000?

 7              A      Yes, sir.

 8              Q      Does the CS stand for Cisco or --

 9              A      No.

10              Q      Who makes it?

11              A      It's Nortel.

12              Q      Made by Nortel.

13              A      Uh-huh.  The CS stands for Centralized

14     System, I believe.

15              Q      Uh-huh.

16              A      I could be wrong.  Again, I haven't

17     used it in over a year.

18              Q      Okay.  Is it -- is it the only one you

19     have or is it one of several?

20              A      As far as the main frame itself is

21     concerned?

22              Q      That's correct.

23              A      You have the main frame and then

24     because we were in two buildings, there's a remote

25     shelf --
```

```
 1            Q       Okay.

 2            A       -- with very limited capabilities.

 3   It's just a call-back or just an extension.

 4            Q       Okay.  So explain to me how that

 5   system worked with the main frame.  Just give me an

 6   overview.  A call comes in.

 7            A       Okay.

 8            Q       It's routed to main frame?

 9            A       A call comes in.  The call is

10   processed in the main frame.  An individual customer or

11   any individual could dial an extension or dial by name

12   or at that point the call would be routed to whichever

13   direction we needed to go.  If it hit the agent, it

14   would follow the same structure as before.  It would hit

15   the agent.  If the agent doesn't answer, then it would

16   go to his team.  If the team didn't answer, it would go

17   to his portfolio.  If the portfolio didn't answer, it

18   then went to the department.

19            Q       Okay.  So that main frame was the

20   brains of the whole phone system.  Correct?

21            A       Correct.

22            Q       And these -- this model here is

23   nothing more than a dummy.  Right?

24            A       Exactly.

25            Q       Okay.  And you say that it's currently
```

1    sitting on the second floor in your headquarters --

2             A       Correct.

3             Q       -- on Market Street?

4             A       Correct.

5             Q       And you could put your hands on it

6    anytime you wanted to.  Right?

7             A       Correct.

8             Q       Did anybody ever tell you not to

9    destroy that main frame?

10            A       No.  Wait.  To not destroy it?

11            Q       Yes.

12            A       It's never been discussed to have it

13   dismantled in any form without a sale.

14            Q       Okay.  Is it -- has it been sitting

15   there for sale all this time?

16            A       Correct.

17            Q       But nobody ever told you, Put that

18   aside, do not let anything happen to it?

19            A       No, sir.

20                    MR. PHILLIPS:  Okay.  I think I'm

21            good, Jimmy.

22                    MR. MITCHELL:  All right.  I just have

23            a couple of follow-ups.

24                          EXAMINATION

25   BY MR. MITCHELL:

1          Q        This Meridian system --

2          A        Uh-huh.

3          Q        -- when it was installed, the whole

4    time it was installed at 21st did it ever have auto

5    dialing capability?

6          A        No, sir.

7          Q        Did it ever have predictive dialing

8    capability?

9          A        No, sir.

10         Q        Did it ever have the capability of

11   using prerecorded calls?

12         A        No, sir.

13         Q        How about the capability of an

14   artificial or prerecorded voice?

15         A        No, sir.

16                  MR. MITCHELL:  Okay.  Thanks.

17                  MR. PHILLIPS:  I've got a follow-up to

18         that.

19                        EXAMINATION

20   BY MR. PHILLIPS:

21         Q        You just stated a minute ago that

22   this -- this phone here is a dummy phone.  Right?

23         A        Correct.

24         Q        So it doesn't have any capabilities,

25   does it?